Sheldon I. Hirshon (SH-0070)
Michael T. Mervis (MM -0306)
Craig A. Damast (CD-4234)
Lawrence S. Elbaum (LE-4157)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

*Counsel for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| 785 Partners LLC, | ) | Case No. 11-13702 (SMB) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S OBJECTION TO MOTION OF FIRST MANHATTAN DEVELOPMENTS REIT FOR ENTRY OF AN ORDER (A) TERMINATING DEBTOR'S EXCLUSIVE PERIOD UNDER 11 U.S.C. §1121 AND (B) REQUIRING ADEQUATE PROTECTION PAYMENTS PURSUANT TO 11 U.S.C. §363(e)**

785 Partners LLC, the above-captioned debtor and debtor-in-possession (the

"<u>Debtor</u>"),[1] by and through its undersigned counsel, as and for its objection (the "<u>Objection</u>") to

the motion of First Manhattan Developments REIT ("<u>First Manhattan</u>") for entry of an order (a)

terminating the Debtor's exclusive period under Section 1121 of Title 11, United States Code, 11

U.S.C. §§ 101 <u>et seq.</u> (the "<u>Bankruptcy Code</u>") and (b) requiring adequate protection payments

pursuant to Section 363(e) of the Bankruptcy Code (the "<u>First Manhattan Motion</u>"), respectfully

represents as follows:

---

[1] Unless otherwise defined, capitalized terms used herein have the meaning ascribed to them in the Plan or the Disclosure Statement (each as defined herein).

# PRELIMINARY STATEMENT

1.      The First Manhattan Motion is the latest in a series of attempts by First Manhattan to frustrate the Debtor's efforts to successfully reorganize for the benefit of all creditors and the Debtor's equity holders.  The motivation of First Manhattan, a real estate developer, is transparent -- it wants to own the Building in which the Debtor's equity holders have invested tens of millions of dollars.  The First Manhattan Motion was not brought in good faith and should be denied because, as the Debtor will show, First Manhattan will not be able to make the showing necessary to obtain either of the forms of relief it seeks.

2.      With regard to that part of the First Manhattan Motion seeking adequate protection payments, First Manhattan ignores that a secured creditor is only entitled to adequate protection payments with respect to a decline in the value of its collateral *as a result of* the use or proposed use of the collateral prior to plan confirmation or *because of* the automatic stay.  Here, the Debtor is not using First Manhattan's purported collateral -- the Building -- nor can it.  On the contrary, the Debtor has been dispossessed of its property by virtue of the pre-petition appointment of the Receiver by a state court judge at the request of the Original Lenders.  The order appointing the Receiver effectively prohibits the Debtor from doing anything at all with the Building.  Since the filing of this case, on the motion of First Manhattan, the Receiver has remained in place and First Manhattan has opposed the Debtor's efforts to regain possession of the Building.  Likewise, First Manhattan has stymied the Debtor's efforts to put the Building to economically productive use prior to confirmation.

3.      Moreover, First Manhattan has not demonstrated, and cannot demonstrate, that there will be any decline in the value of the Building as a result of the automatic stay.  The only such decline First Manhattan even alleges is the purported declining value, over time, of a ten-year tax abatement (the "Abatement").  First Manhattan's argument is that because the

Building remains vacant, the Building is not able to realize the benefit of the Abatement. However, even without the stay, First Manhattan would not be able to take possession of the Building unless and until it becomes the successful bidder at a foreclosure sale as part of the pending state court foreclosure action (the "Foreclosure Action").  Thus, taking at face value First Manhattan's claim that the value of the collateral is being harmed because it is being delayed in taking the Building and selling off condominium units, any such harm is due to the delay inherent in the foreclosure process and not the automatic stay.  Moreover, because this Court has lifted the automatic stay with regard to the prosecution of the Foreclosure Action, any loss in the value of the Abatement that might occur because of the passage of time will, by definition, *not* be caused by the automatic stay.  As the Court has observed, a foreclosure sale is at least a year away.  Add to that the expected one-year time frame to obtain an approved condominium plan (First Manhattan's stated intention for the Building) and then sell units, it is obvious that First Manhattan cannot reasonably argue that the automatic stay is the cause of any decline in the value of the Abatement.

4.     Indeed, it ill-behooves First Manhattan to complain that the Building is losing value because it is vacant, since that circumstance is a result of its own calculated (and patently litigation-driven) decision to prevent the Debtor from monetizing the asset in an extraordinarily strong rental market.  That First Manhattan wants the Debtor to fail so that First Manhattan can take the Building for itself hardly gives it standing to argue that its purported collateral is not being adequately protected.

5.     Lastly, in the event that First Manhattan were somehow able to demonstrate that the Debtor is *using* the Building (which it is not) or that the value of the Building is declining *because of the automatic stay* (which it also is not), the Debtor is prepared

to demonstrate that an equity cushion exists because the value of the Building exceeds the value of First Manhattan's allowable claim. The equity cushion provides First Manhattan with adequate protection.

6. That part of the First Manhattan Motion seeking to terminate the Debtor's exclusive period is even more disingenuous. First Manhattan has, after all, moved to dismiss this case and has already persuaded the Court to lift the automatic stay so that the Foreclosure Action -- which First Manhattan claims it has a right to prosecute -- can proceed. Although the Court deferred decision on the motion to dismiss, First Manhattan has not withdrawn it. In these circumstances, it is obvious that First Manhattan has no sincere interest in resolving this case through a competing plan. Rather, the sole purpose of its application to limit exclusivity is a litigation tactic: First Manhattan wants to exert pressure on the Debtor and its principals by needlessly complicating this case and driving up legal costs -- all in furtherance of its effort to undermine the Debtor's Plan and to obtain the Building.

7. In any event, a creditor must make a substantial showing of "cause" under Section 1121 of the Bankruptcy Code in order to limit a debtor's exclusivity. First Manhattan has not made, and cannot make, such a showing. As illustrated below, application of the factors that courts in this District generally consider in determining whether to terminate a debtor's exclusivity to the facts of this case demonstrates conclusively that there is no cause to terminate exclusivity here.

8. On the contrary, the Debtor has timely filed a plan of reorganization and disclosure statement and it is seeking a prompt adjudication of the issues necessary for confirmation. The Debtor has used the "breathing spell" afforded to it by statute to resolve many of the thorny issues that have plagued the Building for years. Only one issue remains -- whether

and under what terms the Debtor can "cram-down" First Manhattan. Thus, this case will end, one way or the other, within a relatively short period of time. That being so, no legitimate purpose would be served in allowing First Manhattan to file a patently insincere (and, from the brief description of it in First Manhattan's papers, fatally flawed) competing plan at this time.

### BACKGROUND[2]

9. The Debtor owns the land and a 122 unit luxury residential building with retail space located at 785 Eighth Avenue, New York, New York (the "<u>Property</u>" or "<u>Building</u>").

10. On October 6, 2010, in connection with the Foreclosure Action, the state court issued an order (the "<u>Receiver Order</u>") appointing Gerald Kahn as the receiver (the "<u>Receiver</u>"). The Receiver Order requires the Receiver, *inter alia*, "to take control of, secure, and protect the mortgaged premises . . . ." *See* Ex. A to the accompanying Declaration of Lawrence S. Elbaum ("<u>Elbaum Decl.</u>"), dated November 11, 2011, at 2. The Receiver Order also restrains the Debtor from "(1) leasing or selling any units in the mortgaged premises, (2) collecting rents, common charges, revenues, income, issues, profits, license fees, and/or use and occupancy payments in connection with the mortgaged premises, (3) interfering in any manner with the possession of the Receiver; (4) or interfering in any respect with the operations or property." *Id.* at 3.

11. The Receiver Order provides for the Original Lenders (and now First Manhattan) to fund all operating expenses in connection with the Building. In fact, the Receiver is permitted to obtain financing only from First Manhattan.[3] *See id.* at 5 ("[T]he Receiver is

---

[2] The following recitation of facts is not meant to be exhaustive. For a complete recitation of the facts relevant to this case, the Debtor respectfully refers the Court to the Disclosure Statement [Docket No. 71].

[3] Until the appointment of the Receiver, the Debtor assumed and timely paid all operating expenses in connection with the Building.

authorized to receive funds from the Mortgagee to pay the cost of heat, electricity and insurance. . . .").

12.      On August 3, 2011 (the "<u>Petition Date</u>"), the Debtor filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  No official committees have been appointed or designated in this case.

13.      On October 31, 2011, the Debtor timely filed its amended plan of reorganization (the "<u>Plan</u>") [Docket No. 70].[4]  On October 31, 2011, the Debtor timely filed a corresponding disclosure statement (the "<u>Disclosure Statement</u>") [Docket No. 71]. On November 1, 2011, the Debtor filed a motion to, among other things, approve the Disclosure Statement, establish dates and deadlines relative to confirmation of the Plan, and approve procedures for soliciting votes on the Plan (the "<u>Disclosure Statement Approval Motion</u>") [Docket No. 72].  The hearing to approve the Disclosure Statement and solicitation procedures and materials is scheduled for December 6, 2011 at 10:00 a.m.  Pursuant to the Disclosure Statement Approval Motion, the Debtor has requested that the hearing to consider confirmation of the Plan be scheduled by the Court on an expedited basis for December 22, 2011.

14.      Since the Petition Date, Debtor has made, and continues to make, significant progress in its Chapter 11 case.  For example, the Debtor has, among other things:

- reached a global settlement with Fuerta and the End Unit Purchasers after several months of intense negotiations [Docket No. 70];

- filed an application to retain The Weitzman Group, Inc. ("<u>Weitzman</u>") as its real estate and financial consultant;[5]

---

[4] The Plan amended the chapter 11 plan filed by the Debtor with this Court on October 17, 2011 [Docket No. 60].

[5] The Court orally granted the Debtor's application to retain Weitzman at a hearing on November 10, 2011.  At the direction of the Court, the Debtor submitted an order to the Court on November 10, 2011 granting such application.

- made arrangements with Citi Habitats as its marketing and leasing agent for the Building upon confirmation of the Plan; and

- engaged Cooper Square as the manager of the Building upon confirmation of the Plan [Docket No. 43, Exhibit J].[6]

Assuming that First Manhattan votes to reject the Plan, all that remains is for the Debtor to seek to "cram-down" the Plan and to demonstrate that the Plan is "fair and equitable" to First Manhattan within the meaning of Section 1129(b)(2)(A) of the Bankruptcy Code.

### FIRST MANHATTAN IS NOT ENTITLED TO ANY
### ADEQUATE PROTECTION PAYMENTS

15.     Section 363(e) of the Bankruptcy Code provides, in relevant part, that "[n]otwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

16.     As First Manhattan points out in paragraph 27 of the First Manhattan Motion, Section 361(1) of the Bankruptcy Code provides, in relevant part, that adequate protection is required "to the extent that the stay under section 362 of this title, use, sale or lease under section 363 of this title . . . *results in* a decrease in the value of such entity's interest in such property. . ." 11 U.S.C. § 361(1) (emphasis added).

17.     Pursuant to Section 363(p) of the Bankruptcy Code, in connection with any adequate protection motion under Section 363(e), "the trustee has the burden of proof on the issue of adequate protection" and "the entity asserting an interest in property has the burden of

---

[6] Immediately prior to the Petition Date, the Debtor also resolved its own internal partnership disputes through the O'Sullivans' buyout of their 50% partners in the Debtor entity, which involved the O'Sullivans paying over $2 million.

proof on the issue of the validity, priority, or extent of such interest." 11 U.S.C. § 363(p).  *See also In re Elmira Litho, Inc.*, 174 B.R. 892, 905 (Bankr. S.D.N.Y. 1994) (Bernstein, J.).

## First Manhattan's Burden -- Validity, Priority or Extent of Claim

18.     First Manhattan has not provided any substantiation of the validity, priority or extent of its interest in the Building other than the statement in paragraph 9 of the First Manhattan Motion regarding its filing of a proof of claim in the amount of $103,250,000.[7]  To be sure, it is generally accepted that a filed proof of claim is *prima facie* evidence of a creditor's claim.  However, by this Objection, the Debtor, reserving its right to raise additional objections in the future, objects to First Manhattan's proof of claim on the grounds that First Manhattan lacks standing to file a proof of claim and that the amount claimed lacks both legal and computational support.

## The Debtor's Burden -- Adequate Protection

19.     No adequate protection arrangements are required because (i) there will not be a decline in the value of the Building or the Abatement as a result of the use or proposed use of the Building or because of the automatic stay, (ii) if there will be any decline in the value of the Building, it will be caused by the Receiver Order which prevents the Debtor from taking any action in connection with the Building, (iii) the Court has lifted the automatic stay so that the Foreclosure Action can proceed, and thus the purported predicate for Section 361(1) adequate protection arrangements has ceased to exist, and (iv) even if First Manhattan could show a decline in the value of its alleged collateral cognizable under Section 361(1), there exists an equity cushion that provides adequate protection.

---

[7] To prepare for an evidentiary hearing on this aspect of the First Manhattan Motion (should one even be necessary), the Debtor will need discovery on this issue and potentially other issues.  The Debtor has served discovery which seeks information and testimony on this issue, which remains outstanding.

20.     Congress intended Section 363(e) to address decreases in the value of collateral relating to the ongoing use of collateral prior to confirmation of a plan.  *See Marine Midland Bank v. Bennett Funding Group, Inc. (In re Bennett Funding Group, Inc.)*, 1997 Bankr. LEXIS 2197, at *105 (Bankr. N.D.N.Y. Aug. 11, 1997) ("Adequate protection is 'intended to compensate a creditor for any decrease in the value of its security interest in collateral during the pendency of the Debtor's reorganization that is due to the imposition of the automatic stay or is traceable to the use of such property.'"); *In re Cason,* 190 B.R. 917, 928 (Bankr. N.D. Ala. 1995) ("Adequate protection payments are designed to compensate a holder of a secured claim for any decline in the value of its collateral postpetition and preconfirmation."); *In re Ingle*, 91 B.R. 27 (Bankr. E.D. Mich. 1988) (under Section 363(e), debtor had "an obligation to provide adequate protection to a creditor who holds a security interest in property used by the debtor in the pre-confirmation time period."); *In re Turner*, 82 B.R. 465, 468 (Bankr. W.D. Tenn. 1988) (explaining adequate protection payments are available "for a limited time between the filing of the Debtors' petition and the confirmation of a plan or denial of confirmation.  Adequate protection is not a concept that is included in the plan payments, since the Code contemplates that the creditor will receive value, as of the effective date of the plan, not less than the allowed amount of the secured creditor's claim."); *In re Allen Carpet Shops, Inc.*, 25 B.R. 595, 602 (Bankr. E.D.N.Y. 1982) (Section 363(e) "is designed primarily to 'protect the collateral of secured creditors while the debtor or a trustee continues to operate the business.'").

21.     "In order to establish a *prima facie* case of a lack of adequate protection, the moving party must provide evidence that the value of the collateralized property is declining, or at least threatened, as a result of the automatic stay."  *In re Panther Mountain Land Dev., LLC*, 438 B.R. 169, 190-91 (Bankr. E.D. Ark. 2010), citing *Elmira Litho, Inc.*, 174 B.R. at 903.

22.     First Manhattan cannot satisfy the above-described standards.  To begin with, the plain language of Section 363(e) permits adequate protection payments only where property is "used, sold, or leased, or proposed to be used, sold or leased".  The Debtor is not currently using, selling or leasing the Building, nor can it because the Receiver is in possession of the Building and the Receiver Order -- which remains in place at First Manhattan's insistence -- prohibits the Debtor from doing so.  Furthermore, the Debtor is not currently proposing to use the Building until such time as its Plan is confirmed.

23.     Accordingly, First Manhattan's reliance on *In re Airwalk Int'l, LLC*, 305 B.R. 34 (Bankr. D. Colo. 2003), is misplaced.  *Airwalk* concerned a debtor's ongoing use of a secured creditor's collateral (its patents, trademarks and licensing agreements).  Here, in contrast, the Debtor is not using First Manhattan's purported collateral and is, in fact, currently prohibited under the Receiver Order from doing so.

24.     First Manhattan also has complained that the Debtor is not, and cannot, pay the operating expenses of the Building and First Manhattan should be paid adequate protection for the amounts it provides for Building operating expenses.  First Manhattan cannot plausibly complain in light of the Receiver Order it has vigorously sought to enforce.  As noted above, the Receiver Order does not allow the Receiver to accept funding from the Debtor.  Further, in connection with its motion to remove the Receiver, a motion First Manhattan opposed, the Debtor offered to arrange funding for the operating expenses without seeking administrative expense protection.  *See* para. 42, *infra*.  In effect, the Receiver Order itself is the adequate protection First Manhattan seeks.

25.     First Manhattan also cannot show that the Building is diminishing in value as a result of the automatic stay.  First Manhattan argues that the value of the Building is

diminishing because it remains vacant notwithstanding that the 10-year clock for the Abatement is running.[8]  In making this argument, First Manhattan ignores the fact that the Building is only vacant because it and the Original Lenders have steadfastly refused to permit the Debtor from taking action to monetize the Building by leasing the Units.  Simply put, because the Receiver and the Receiver Order are in place, the Debtor is unable to cause the Building to be occupied by paying tenants.  *See* Elbaum Decl. Ex. A at 3 ("Defendants . . . are enjoined and restrained from (1) <u>leasing or selling</u> any units in the mortgaged premises, (2) collecting rents, common charges, revenues, income, issues, profits, license fees, and/or <u>use and occupancy payments</u> in connection with the mortgaged premises, (3) interfering in any manner with the possession of the Receiver, (4) or interfering in any respect with the operations or property. . . .") (emphasis added).

        26.     First Manhattan's refusal to permit the Debtor to lease the Units in what by all accounts is one of the strongest luxury rental markets in memory (*see*, *e.g.*, Marc Santora, *The Lease Is Up, and Now, So Is the Rent*, N.Y. Times, October 14, 2011, *available at* http://www.nytimes.com/2011/10/16/realestate/rents-in-manhattan-rebound-to-record-highs.html (Elbaum Decl. Ex. B)) makes clear that First Manhattan's real concern is not any diminution in the value of the Building related to the Abatement but rather its desire to stymie the Debtor's efforts to reorganize so that it can take the Building from the Debtor.  It is undeniable that market conditions are causing the value of the Building to *increase* -- not decrease -- during the pendency of this case.  That in itself is a reason to deny the adequate protection portion of the First Manhattan Motion.  *See Save Power Ltd. v. Pursuit Athletic Footwear (In re Pursuit Athletic Footwear),* 193 B.R. 713, 716 (Bankr. D. Del. 1996) (denying motion for adequate

---

[8] First Manhattan does not even try to quantify this alleged loss, nor is it clear that such a purported loss could ever be reasonably quantified for purposes of setting the amount of any adequate protection payments.

protection where creditor did not establish decrease in post-petition collateral and some evidence indicated there had been an increase in value).

27.     In any event, any decrease in value attributable to the passage of time will not be caused by the automatic stay. As noted, at the moment the Receiver controls the Building. Moreover, First Manhattan will have no right or ability to use the Building unless and until it is the winning bidder at any auction in the Foreclosure Action.[9] The Court has lifted the automatic stay as it pertains to the prosecution of the Foreclosure Action with respect to the Building. Thus, the progress of the Foreclosure Action is not being hampered by the automatic stay.[10] *See Qmect, Inc. v. Burlingame Capital Partners II, L.P.*, 373 B.R. 682, 689-690 (N.D. Cal. 2007). ("[a]dequate protection is made available to protect creditors from the diminution of collateral during the pendency of the bankruptcy petition; not to compensate creditors for delay in being able to foreclose on collateral.").

28.     Finally, to the extent it may be necessary to do so at the hearing on the First Manhattan Motion (and it should not be due to First Manhattan's failure to show any use by the Debtor of the Building or decrease in value caused by the automatic stay), the Debtor is prepared to show that there exists an equity cushion which provides adequate protection. An equity cushion has been defined as "the value in the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effect." *LNC Invs., Inc. v.*

---

[9]  It is equally evident that the Debtor will have no right or ability to use the Building unless and until either the Plan is confirmed or its motion to remove the Receiver, which has been adjourned to the disclosure statement hearing date and is likely to be adjourned to the confirmation date, is granted.

[10] To be sure, the stay has not been lifted to permit a foreclosure sale. But any argument about adequate protection relating to a stay of a foreclosure sale is simply not ripe at this point in time. Moreover, as a practical matter, this case will almost certainly be concluded well before any foreclosure sale could be scheduled in the Foreclosure Action.

*First Fid. Bank, N.A.*, 1995 U.S. Dist. LEXIS 5065, at *9-10 (S.D.N.Y. Apr. 18, 1995), citing *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). The equity cushion calculation "ignores junior liens and focuses on the *creditor's* interest in the collateral. Thus, although a debtor may lack equity in its property, a senior lienor may nonetheless enjoy a substantial equity cushion in that property." *Elmira Litho*, 174 B.R. at 904 (citations omitted).

29. "It is beyond cavil that an equity cushion can, under certain circumstances, serve as a form of adequate protection." *Elmira Litho*, 174 B.R. at 904. Indeed, courts have regularly determined that where there is a sufficient equity cushion, "adequate protection" exists under Sections 362(d)(1) and 363(e).[11] *See Capital Communs. Fed. Credit Union v. Boodrow (In re Boodrow)*, 126 F.3d 43, 53 (2d Cir. 1997) (where the value of the property exceeded the amount outstanding on the loan by 10% the equity cushion provided adequate protection to deny motion to lift the automatic stay) (citations omitted); *In re Hirsch*, 360 B.R. 43, 48 (Bankr. E.D.N.Y. 2007) (finding adequate protection under Section 362(d)(1) because "a large equity cushion exists for each property," even though "continuing non-payment of the mortgage and real estate taxes would diminish this equity cushion"); *In re Realty Southwest Assoc.*, 140 B.R. 360, 367 (Bankr. S.D.N.Y. 1992) (secured creditor was "adequately protected pursuant to 11 U.S.C. § 363(e) because of the substantial equity cushion in the Properties"); *In re Constable Plaza Assoc. L.P.*, 125 B.R. 98, 104-05 (Bankr. S.D.N.Y. 1991) (as a result of an equity cushion between the amount of the secured creditor's claim and the value of the secured property, the secured creditor was adequately protected under Section 363(e)).

---

[11] "'Adequate protection' under Sections 362 and 363 means the same." *Elmira Litho*, 174 B.R. at 905.

## THE DEBTOR'S PLAN EXCLUSIVITY SHOULD NOT BE TERMINATED

30.     Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to propose and file a chapter 11 plan (the "Plan Period").  *See* 11 U.S.C. § 1121(b).  Section 1121(c)(3) of the Bankruptcy Code provides that, if a debtor files a plan within the 120-day Plan Period, it has a period of 180 days after the commencement of the case to obtain acceptance of such plan, during which time competing plans may not be filed (the "Solicitation Period", and together with the Plan Period, the "Exclusive Periods").  *See* 11 U.S.C. § 1121(c)(3).[12]

31.     Congress built flexibility into Section 1121 of the Bankruptcy Code to give a debtor a sufficient opportunity to stabilize its business operations at the outset of its chapter 11 case and to negotiate an effective plan of reorganization with creditors.  *In re Newark Airport/Hotel Ltd. P'ship*, 156 B.R. 444, 451 (Bankr. D.N.J.), *aff'd*, 155 B.R. 93 (D.N.J. 1993) (noting that Congress designed chapter 11 provisions to enable a debtor to remain in control for some period of time, thereby making reorganization an attractive alternative to financially troubled companies); *Gaines v. Perkins* (*In re Perkins*), 71 B.R. 294, 297-98 (W.D. Tenn. 1987) (noting that Congress designed Section 1121 to give a debtor time to reach an agreement with its creditors regarding a plan of reorganization).

32.     There are few cases that have granted "reductions" of the Exclusive Periods.  It has been explained that "when that change is a reduction in the statutory period, the burden is especially heavy."  *In re Lehigh Valley Prof'l Sports Clubs, Inc.*, 2000 Bankr. LEXIS 237, at *10-13 (Bankr. E.D. Pa. Mar. 14, 2000).

---

[12] Accordingly, by virtue of the Debtor having filed the Plan, pursuant to Section 1121(c)(3), competing plans may not be filed prior to January 30, 2012.

33.     Section 1121(d) of the Bankruptcy Code provides that the Exclusive Periods can be reduced for "cause".  *See* 11 U.S.C. § 1121(d)(1).  Although the Bankruptcy Code does not define the term "cause," the legislative history indicates it is intended to be a flexible standard to balance the competing interests of a debtor and its creditors.  *See* H.R. Rep. No. 95-595, at 231-32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6191 (noting that Congress intended to give bankruptcy courts flexibility to protect a debtor's interests by allowing unimpeded opportunity to negotiate settlement of debts without interference from other parties in interest).

34.     "The determination of cause under Section 1121(d) is a fact-specific inquiry. . . ."  *In re Borders Group, Inc.*, 2011 Bankr. LEXIS 2150, at *5 (Bankr. S.D.N.Y. June 2, 2011).  In determining whether cause exists to reduce the Exclusive Periods, courts in this District typically consider:  "(a) the size and complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists."  *Id.*; *see also In re Adelphia Communs. Corp.*, 336 B.R. 610, 674 (Bankr. S.D.N.Y. 2006) (citing *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997)).

35.     When a court considers the above-enumerated factors in deciding whether to reduce the Exclusive Periods, it is not limited to the task of counting factors.  *Dow Corning*,

208 B.R. at 699. Sometimes certain factors are more relevant, important, or persuasive than others, and sometimes one or more factors determine the particular result. *Id.* As set forth below, a consideration of the above factors overwhelmingly militates towards the denial of First Manhattan's request to terminate the Solicitation Period.

**The Complexity Of The Debtor's Chapter 11 Case**

36.     Although this is a single asset real estate case, the Debtor's case is not as simple as First Manhattan suggests. The Debtor's case involves complex disputes between the Debtor, Fuerta and the End Unit Purchasers which took months of extensive post-petition negotiations to resolve. Unfortunately, the Debtor has thus far been unable to similarly resolve matters with First Manhattan.

37.     First Manhattan also has stated its intent to reject the Plan. The Plan, therefore, appears to be headed toward a contested, evidentiary confirmation hearing concerning, among other things, the value of the Building, the feasibility of the Plan, and whether the Plan treats First Manhattan "fairly and equitably", including the proper "cram-down" interest rate and other terms to be applied with respect to the treatment of First Manhattan's claim.

38.     Accordingly, a consideration of this factor does not support First Manhattan's request to terminate the Solicitation Period.

**Necessity For Sufficient Time To Negotiate Plan And Prepare Adequate Information**

39.     The Plan and the Disclosure Statement already have been filed. Accordingly, this factor is not applicable.

**The Debtor's Good Faith Progress Toward Reorganization**

40.     First Manhattan cannot reasonably dispute that the Debtor has made good faith progress toward reorganization in this case, which has been pending for just over three months. The Debtor has formulated a viable business plan (as embodied in the Plan), settled

complex disputes with Fuerta and the End Unit Purchasers after months of intense negotiations, as memorialized by the Fuerta Settlement Agreement and embodied in the Plan, made arrangements with Citi Habitats for the lease-up of the Building and with Cooper Square for the management of the Building, all of which are contained in the Plan and the Disclosure Statement. The Debtor has made this progress notwithstanding the "scorched earth" litigation tactics of First Manhattan which have included, without limitation, the filing of:

- a motion just six days after the Petition Date to keep the Receiver in possession of the Building;

- a motion just sixteen days after the Petition Date to dismiss the Debtor's chapter 11 case or, in the alternative, grant First Manhattan relief from the automatic stay;

- an objection to the Debtor's application to retain The Weitzman Group, Inc. as its real estate and financial consultant; and

- the instant First Manhattan Motion.[13]

Accordingly, the Debtor should not be penalized for its progress in advancing its Chapter 11 case by the termination of the Solicitation Period.

**Payment Of Bills As They Come Due**

41.     This factor does not apply to the Debtor because the Building remains in the possession of the Receiver. The Receiver Order restrains the Debtor from interfering in any manner with the possession of the Receiver or interfering in any respect with the operations of the Building. *See* Elbaum Decl. Ex. A at 3. As a result, the Debtor is prohibited from paying any bills with respect to the Building. *Id.* at 4 ("Defendants . . . are hereby directed to

---

[13]   In open court on Thursday, November 10, 2011,counsel for First Manhattan announced it would shortly file for declaratory relief regarding the Debtor's right, title and interest to the BPA Down Payment Escrow. While it is premature to comment on this issue substantively, the Debtor notes this would be yet another expensive tactic by First Manhattan as any such litigation will not conceivably be resolved prior to the Debtor's proposed confirmation date of December 22, 2011 and, as important, the very issue will be resolved by the Court's approval of the Fuerta Settlement Agreement that is part of the Plan.

immediately deliver or cause to be delivered to the Receiver . . . all monies constituting operating, reserve or escrow funds presently on deposit at any financial institution . . . .").

42.     First Manhattan also conveniently omits in its discussion of this factor that pending before this Court, but opposed by First Manhattan, is the Debtor's motion to compel the Receiver to comply with Sections 543(a) and (b) of the Bankruptcy Code by turning over the Building to the Debtor and to approve a property management agreement with Cooper Square Realty, Inc. (the "Debtor's Receiver Motion") [Docket No. 42].  The Debtor's Receiver Motion provides that one of the affiliates of the principals of the Debtor will advance funds necessary to cover the maintenance and carry costs associated with Building going forward in a manner that does not impair the value of any claims or liens against the estate.  Since the filing of the Debtor's Receiver Motion, the Debtor has stood ready to meet its obligations to pay bills as they become due once the Receiver is ordered to turn over the Building.

43.     Moreover, First Manhattan (and its predecessors) cannot dispute that the Debtor timely paid the Building's bills as they became due before the Receiver took possession of the Building.  Therefore, to the extent this factor does apply in these circumstances, it provides no support for First Manhattan's request to terminate the Solicitation Period.

**Reasonable Prospects For Filing Viable Plan**

44.     The Debtor already has filed a viable Plan and is prepared to have a confirmation hearing as early as December 22, 2011.  Assuming that First Manhattan votes to reject the Plan, the Debtor nonetheless will seek to "cram-down" the Plan.  In that regard, the Debtor will demonstrate at the confirmation hearing that the Plan is "fair and equitable" to First Manhattan within the meaning of Section 1129(b)(2)(A) of the Bankruptcy Code.

45. First Manhattan's argument that the Plan violates the "absolute priority rule" is misplaced. Section 1129(b)(2)(B) of the Bankruptcy Code provides, in pertinent part, that

> "[t]he condition that a plan be fair and equitable with respect to a class includes the following requirements: … (B) With respect to a class of unsecured claims – (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property… ."

11 U.S.C. § 1129(b)(2)(B).

46. The absolute priority rule, as embodied in Section 1129(b)(2)(B)(ii) of the Bankruptcy Code, is not implicated here. The absolute priority rule is implicated only when there is a dissenting class of *unsecured* creditors and the proponent of the plan is seeking to "cram-down" the plan on that dissenting class. In that event, the plan proponent must demonstrate that the plan is "fair and equitable" to that class. All classes of unsecured creditors under the Plan entitled to vote are expected to accept the Plan, so Section 1129(b)(2)(B) is irrelevant. In connection with Plan confirmation, the Debtor will demonstrate that First Manhattan is oversecured. Accordingly, it lacks standing to rely on Section 1129(b)(2)(B).[14]

47. In the First Manhattan Motion, First Manhattan "previews" its purported competing plan. As a threshold matter, the Debtor expects to argue that First Manhattan is not an "Eligible Lender" under the Building Loan Agreement which, among other things, impacts whether First Manhattan holds a valid claim against the Debtor and whether First Manhattan has standing to propose a competing plan. Moreover, the fact that such a plan would involve

---

[14] First Manhattan attempts to "have its cake and eat it too" by asserting, on the one hand, that it holds a general unsecured claim (presumably because it believes it is undersecured, which the Debtor disputes) and therefore is entitled to assert a violation of the "absolute priority rule" while asserting, on the other hand, that it is entitled to post-petition interest on its claim (which it is only entitled to if it is oversecured). Of course, First Manhattan cannot have it both ways.

transferring title of the Property to First Manhattan in satisfaction of its secured claim, rather than providing for an auction sale of the Property for the benefit of all stakeholders (creditors and interest holders alike), manifests First Manhattan's clear intent to own the Property -- and to compete directly with the Debtor -- rather than to have its debt repaid. If the Debtor proves First Manhattan's intent is to frustrate the Debtor's reorganization in an effort to obtain the Building, the Court could designate First Manhattan under prevailing Second Circuit precedent. *See In re DBSD N. America, Inc.*, 419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, 634 F.3d 79 (2d Cir. 2010).

48.　　In any event, any such competing plan would contain significant hurdles, thereby making confirmation highly uncertain. For example, while First Manhattan states that it would "[settle] with Fuerta by providing greater value to Fuerta upon confirmation", First Manhattan provides no details concerning such settlement and ignores the fact that the End Unit Purchasers' asserted right to Units would need to be resolved in the context of any competing plan. Under the Debtor's Plan, on the other hand, the dispute with the End Unit Purchasers has been resolved and settled.

49.　　First Manhattan also ignores entirely the valid second lien against the Property held by Time Square.[15] The treatment of the Time Square lien would depend on the value of the Building. Time Square would have both a secured and unsecured claim if there is sufficient value to reach the second lien but not fully cover the claim. In that scenario, the First Manhattan plan would have to recognize the secured portion of the claim (presumably, First Manhattan would seek to cram-down the second lien) and provide a treatment for the unsecured portion. In paragraph 20 of the First Manhattan Motion, First Manhattan states it will pay all

---

[15]　　As noted by First Manhattan's counsel at the October 19th hearing in this Court in connection with First Manhattan's dismissal/lift stay motion, the Time Square lien is valid and undisputed. *See* Elbaum Decl. Ex. C at 23:23-24:2.

general unsecured claims in full, and that would have to include any unsecured portion of the second lien. On the other hand, as long as the secured portion of the lien is not an inconsequential amount, Time Square could opt to have its entire claim deemed secured under Section 1111(b) of the Bankruptcy Code and abandon its unsecured claim. In that scenario, First Manhattan would need to provide a treatment that would meet the fair and equitable requirements of Section 1129(b)(2)(A)(i) of the Bankruptcy Code for the entire amount of the second lien.

50.     Assuming the First Manhattan lien is not fully secured, the Time Square second lien would be totally unsecured. While Section 1111(b)(1)(B)(i) of the Bankruptcy Code would prohibit the election in this situation, under the competing plan proposed by First Manhattan, the entire unsecured claim would need to be paid in full, along with the other general unsecured creditors (otherwise there would be an impermissible discrimination between unsecured creditors).

51.     In paragraph 22 of the First Manhattan Motion, First Manhattan contends, without citation to any case law, that a court should terminate a debtor's exclusivity, and permit competing plans to be filed, if the debtor has filed a "cramdown plan" within the 120-day exclusivity period. In such situations, First Manhattan continues, exclusivity should be terminated before the expiration of the 180-day acceptance period. Courts, however, have both denied termination of, and granted extensions of, a debtor's exclusivity where a cram-down plan was either on file or in the works. *See, e.g.*, *In re Lehigh Valley Prof'l Sports Clubs, Inc.*, 2000 Bankr. LEXIS 237, at *19 (Bankr. E.D. Pa. Mar. 14, 2000) (denying motion to terminate exclusivity in context of potential cramdown plan); *In re Homestead Partners*, 197 B.R. 706, 714 (Bankr. N.D. Ga. 1996) (denying motion to terminate plan exclusivity and granting motion to

extend exclusivity where court considered cram-down plan); *In re R&G Props.*, 2009 Bankr. LEXIS 221, at *8-15 (Bankr. D. Vt. Jan. 28, 2009) (granting extension of exclusivity period where "the Debtor has been unequivocal about its intention to propose a plan that will cramdown Capmark's claim and Capmark has been equally candid about its intent to fight zealously any attempt by the Debtor to regain possession of its assets"); *In re Lionel LLC*, 2008 Bankr. LEXIS 1047, at *65-66 (Bankr. S.D.N.Y. Mar. 31, 2008) (granting extension of exclusivity where cram-down plan proposed).

52.     Lastly, with respect to the Debtor's Plan, there is no prohibition, as asserted by First Manhattan, against the use of cash collateral (such as the BPA Down Payment Escrow) to fund a reorganization plan. *See Pacific First Bank ex rel. RT Capital Corp. v. Boulders on the River (In re Boulders on the River)*, 164 B.R. 99 (B.A.P. 9th Cir. 1994) (reorganization plan was "proposed in good faith" and treated secured creditor's claim "fairly and equitably" where plan used secured creditor's cash collateral to pay unsecured creditors, property taxes, legal costs of bankruptcy, debt service reserve, and capital placement reserve); *In re Master Mortgage Inv. Fund*, 168 B.R. 930, 933 (Bankr. W.D. Mo. 1994) (confirming reorganization plan partially funded by collateral sale proceeds); *In re Dindiyal*, 1993 Bankr. LEXIS 1832, at *21-23 (Bankr. E.D.N.Y. Sept. 30, 1993) (in cram-down context, authorizing debtor to use secured creditor's rent income cash collateral to fund reorganization plan where equity cushion provided adequate protection).

**The Debtor Has Made Progress In Negotiations With Creditors**

53.     The Debtor has made significant progress in negotiations with its creditors, including Fuerta and the End Unit Purchasers. The Fuerta Settlement Agreement, among other things, resolves all of the claims and potential claims of Fuerta and the End Unit

Purchasers against the Debtor and provides for the disposition of the BPA Down Payment

Escrow upon the occurrence of the Effective Date of the Plan. The approval of the Fuerta

Settlement Agreement, which is attached to and incorporated into the Plan, was the product of

extensive negotiations between the Debtor and various creditor constituencies over several

months. It will avoid time-consuming, expensive and complex litigation respecting the claims

and allegations of Fuerta and the End Unit Purchasers, the results of which are far from certain.

Accordingly, a consideration of this factor weighs decidedly against termination of the

Solicitation Period.

**Little Time Has Elapsed In This Case**

54. As of the date hereof, the Debtor has been in bankruptcy for just over

three months. There is really only one issue left in this case -- whether and on what terms First

Manhattan will be crammed down. As noted, the Debtor has requested that the confirmation

hearing be held before the end of the year. In short, this case will be resolved, one way or the the

other, in the relatively near future. And, in the meantime, the Foreclosure Action will continue,

thereby eliminating any prejudice to First Manhattan during the pendency of this case.

**The Debtor Is Not Pressuring Creditors To Submit To Any Reorganization Demands**

55. The Debtor already has filed its Plan. Other than seeking to "cram-down"

First Manhattan, the Debtor has achieved a negotiated resolution with all of its creditors. This

factor, therefore, provides no support for First Manhattan's request to terminate the Solicitation

Period.

*      *      *

56. For all of the foregoing reasons, the portion of the First Manhattan Motion

requesting termination of the Solicitation Period should be denied.

WHEREFORE, the Debtor respectfully requests entry of an order (i) denying the First Manhattan Motion in its entirety and (ii) granting the Debtor such relief as the Court deems just and proper.

Dated:  November 11, 2011

PROSKAUER ROSE LLP

_/s/ Sheldon I. Hirshon_____
Sheldon I. Hirshon (SH-0070)
Michael T. Mervis (MM -0306)
Craig A. Damast (CD-4234)
Lawrence S. Elbaum (LE-4157)
Eleven Times Square
New York, New York 10036-8299
Telephone: (212) 969-3000
Facsimile:  (212) 969-2900

*Counsel for the Debtor and Debtor in Possession*