UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                    :
                                          :         Chapter 11
       785 PARTNERS LLC,               :         Case No. 11-13702 (SMB)
                                          :
                Debtor.        :
------------------------------------------------------X

## MEMORANDUM DECISION REGARDING
## VALUE OF DEBTOR'S BUILDING

**A P P E A R A N C E S :**

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299

      Sheldon I. Hirshon, Esq.
      Michael T. Mervis, Esq.
      Craig A. Damast, Esq.
      Lawrence S. Elbaum, Esq.
        Of Counsel

*Attorneys for Debtor and Debtor in Possession*

SILVERMANACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753

      Gerard R. Luckman, Esq.
      Jay S. Hellman, Esq.
        Of Counsel

      — and —

SCHIFF HARDIN, LLP
666 Fifth Avenue, 17th Floor
New York, NY 10103

      Thomas P. Battistoni, Esq.
      Louis T. DeLucia, Esq.
        Of Counsel

*Attorneys for First Manhattan Developments REIT*

STIEFEL & COHEN
770 Lexington Avenue
New York, NY 10065

      Philip P. Foote, Esq.
        Of Counsel

*Attorneys for Martin McGinn, Aileen McGinn*

JOHN H. SNYDER PLLC
555 Fifth Avenue, Suite 1700
New York, NY 10017

      John H. Snyder, Esq.

*Attorneys for Times Square Construction & Development*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The Debtor seeks to confirm its plan in this single asset real estate case, and First

Manhattan Developments REIT ("First Manhattan" or "FM"), the principal secured creditor, has

filed objections.  The amount of First Manhattan's claim and the value of the Debtor's building

(the "Building") represent two of the most significant and contentious issues in connection with

the confirmation of the plan.  Accordingly, and with the agreement of the parties, the Court first

proceeded to determine the value of the Building.  Following a five day of evidentiary hearing, I

find that the value of the Building as a rental, its highest and best use, is $91.7 million.[1]

A.    **Introduction**

The Building is forty-three stories, consists of 122 residential apartments or units, and

covers between 94,142 and 94,311 aggregate square feet in addition to retail space whose precise

area is open to question for reasons discussed below.  The Building is located at 48th Street and

Eighth Avenue in the Hell's Kitchen/Clinton area of Manhattan, bounded by Eighth Avenue on

---

[1]      The following conventions are used in this decision.  The hearing transcripts are cited as "Tr." with the date of the hearing noted parenthetically.  "DX" refers to the Debtor's trial exhibits and "FMX" refers to First Manhattan's trial exhibits.

the east, the Hudson River on the west, 59th Street on the north and 34th Street on the south.  It is an anvil-shaped "sliver" building with approximately twenty-four feet of frontage on Eighth Avenue and seventeen feet of frontage on 48th Street.  The Building, which is new and presently vacant, stands as security for a loan now held by First Manhattan, which purchased the note in or around July 2011 for approximately $78 million.

With certain exceptions, each floor typically contains three apartments.  Ninety apartments consist of one bedroom and one bathroom.  The average size of the one bedroom apartments is between 734 and 736 square feet, depending on which expert's report you read.  I will use 735 square feet.  Seventeen apartments are studio apartments that average 604 square feet.  Thirteen apartments are two bedroom apartments and range between 1,104 square feet and 1,186 square feet.  One three bedroom apartment, the penthouse, is 2,725 square feet.  Finally, the superintendent's apartment measures 556 square feet.  (*See generally* DX 1 at 51-52; FMX J at 42.)  All agree that the Building enjoys excellent views to the west above the lower floors and very good views from the upper floors in other directions.  The principal and only amenity in the Building, aside from a doorman, is a small fitness center.

As noted, the Court conducted a five-day evidentiary hearing for the purpose of determining the value of the Building.  Several witnesses testified, but the most important witnesses on the issue of valuation were the Debtor's expert, Michael Falsetta, and First Manhattan's expert, Dennis Ryan.  Both experts testified honestly and credibly, and the stark difference in their appraisals illustrates the subjective nature of valuation.  Each expert submitted a report, referred to as the *Falsetta Report* (DX 1) and the *Ryan Report* (FMX J), and each also submitted a supplement, referred to as the *Falsetta Supplement* (DX 2) and the *Ryan Supplement* (FMX N).  The Debtor contends that the highest and best use for the Building is as a rental.

3

According to Mr. Falsetta, the Building is worth $103 million as a rental and $93.3 million as a condominium.  First Manhattan maintains that the highest and best use for the Building is as a condominium.   According to Mr. Ryan, the Building is worth $76.4 million as a condominium and $70.3 million as a rental.

**B.    Value as a Condominium**

Both experts valued the Building as a condominium on a net sellout basis.  The net sellout approach is essentially a discounted cash flow analysis that assumes a buyer will buy the entire building at wholesale and then sell the apartments over time at retail.  The net income realized over the period of the sellout is then discounted back to present day.

The spread between the experts' opinions regarding the value as a condominium is $16,900,000.  The principal factors that affect the value are the absorption or sellout period, the assumed selling price of the apartments and the commercial space, and the expenses that the buyer must pay during the period of the sellout and before the expenses are picked up entirely by the unit owners as part of the common charges.

**1.    Selling Price of the Residential Units**

The principal difference in the two appraisals relates to the assumed selling price of the apartments.[2]  According to Mr. Falsetta, the average selling price of the residential space is $1,250 per square foot and the saleable area of the Building is 94,311 square feet.  This yields a gross undiscounted sellout value of the residential space of $117,888,750.  (*Falsetta Report* at

---

[2]    Both sides assumed a similar absorption period, 30 versus 34 months, although they disagreed on when the sales would actually begin.  In addition, and as discussed below, the different assumptions relating to the value of the commercial unit and the expenses did affect the respective value opinions, but not to the degree of the different conclusions regarding the selling price of the units.

100.)  According to Mr. Ryan, the average selling price of the residential space is currently

$1,100 per square foot and the saleable area of the Building is 94,142 square feet.  This yields a

gross undiscounted sellout value of the residential space of $109,543,631.[3]  (*See Ryan Report* at

104.)

Both experts supported their opinions with data derived from the sales of apartments in

other, comparable buildings.  Comparability, however, as well any adjustments needed to make

the comparison more comparable is highly subjective.  For the most part, Mr. Ryan's

methodology was easier to follow because he showed how he made adjustments to his

comparables based on location, apartment features, views and amenities.[4]  (*See Ryan Report* at

77.)  In addition, the *Ryan Supplement* included data about many recent sales in buildings

described in the *Ryan Report*.

In particular, Mr. Ryan's reports suggest that the Debtor has overestimated the selling

price of the condominium units.  The overwhelming majority of the apartments in the Building

(nearly 90%) are one bedroom, one bathroom units with an average size of 735 square feet.

Sticking as close as possible to these criteria, the Court reviewed the comparables in the *Ryan

Report* and the *Ryan Supplement* to determine the selling price of one bedroom, one bathroom

apartments between 700 and 800 square feet in size.[5]  No apartment met these criteria in the

---

[3]      Mr. Ryan's analysis assumed that the price per square foot would rise incrementally to $1,199 during the sellout period.  (*See Ryan Report* at 104.)

[4]      Residents must pay separately for certain amenities (*e.g.,* parking).  Mr. Ryan nevertheless opined that their availability, even at an added cost, adds value to the condominium unit.  I credit this testimony.

[5]      Mr. Ryan dropped certain comparable buildings in his *Supplement*, and I have ignored these buildings.  I also ignored apartments that were merely *listed* at a price or were in contract but not yet closed.  Listings reflect the seller's asking price which may be negotiated downward.  Contracts may not close, or may close at different prices.

Platinum, the Dillon and the Hudson Hill. A number of apartments met these criteria in his other

buildings:

| Building | No. of sales | Avg. price per sq. foot | Adjustments per Mr. Ryan | Adjusted avg. price per sq. ft. |
|----------|--------------|-------------------------|--------------------------|----------------------------------|
| Orion | 13 | 1,191.08 | -30% | 883.76 |
| Link | 3 | 1,296.00 | -20% | 1,036,80 |
| Element | 5 | 1,171.80 | -20% | 937.44 |
| Atelier | 8 | 1,066.88 | -10% | 960.19 |
| Griffin Court | 1 | 931.00 | +10% | 1,024.10 |

Although these results support Mr. Ryan's opinion that the appropriate sale price is

$1,100 per square foot if not less, another portion of the *Ryan Report* undercuts this conclusion.

In projecting the common charges attributable to the unit owners, which include the cost of

financing the condominium association's purchase of the superintendent's apartment, Mr. Ryan

estimated the market value of the superintendent's apartment at $1,150 per square foot. (*Ryan

Report* at 99.) It is difficult to believe that the superintendent's fourth floor apartment, lacking a

view in a view-driven building, is one of the more valuable apartments in the Building on a

square foot basis.

This leads me to conclude that Mr. Ryan's opinion regarding the value of the apartments

in the Building, based in large part on the adjustments he adopted, is too conservative; with less

"adjustment," his conclusion regarding value would be higher.[6] Consequently, I give more credit

to his value of the superintendent's apartment, and for the reasons indicated, view it as setting the

lower end of value. Accordingly, I find that the average value of the residential space is $1,175

---

[6]      In addition, Mr. Ryan's valuations, both as a rental and as a condominium, are less than the $78 million that
First Manhattan paid for the note in July 2011, when it was already in default. The trial evidence did not suggest
that the value of the Building declined after First Manhattan purchased the note.

per square foot, the average price of a one bedroom, one bathroom apartment is $863,625, and

the gross undiscounted selling price of all of the residential space is $110,716,725.[7]

### 2.    Selling Price of Retail Unit

The contours of the retail space are unclear.  According to Mr. Falsetta, it totals 2,578

square feet, consisting of 1,838 square feet of grade level space and 740 square feet of storage

space in the cellar.  In addition, the space includes an outdoor terrace/patio of approximately 730

square feet which can be used for seating if the retail space is a restaurant.  (*Falsetta Report* at

1.)  Mr. Falsetta valued the grade level space at $225 per square foot and the patio at $50 per

square foot, but did not ascribe any value to the cellar space.  (*Id.* at 73-74.)  According to Mr.

Ryan, the retail space comprises 2,766 square feet, all located at the grade level, which he valued

at $150 per square foot.  (*See Ryan Report* at 92.)  It is not clear whether his valuation included

the patio or the basement—it couldn't include both based on the aggregate square footage—but it

is clear that he ascribed the same value to all of the space.  Although Mr. Falsetta criticized Mr.

Ryan's reliance on rentals paid by Ninth Avenue stores (the Building and its commercial unit are

located on Eighth Avenue), Mr. Ryan's use of a uniform rate, well above the rate Mr. Falsetta

applied to the patio space, minimizes the perceived error in using Ninth Avenue comparables.

Indeed, in the end, the parties' disagreement regarding the value of the retail space was

immaterial to the ultimate question of value.  Both parties valued the retail space for

condominium purposes based on the amount of rental income that it could generate.  Mr. Falsetta

predicted gross annual income of $450,000.00, deducted a vacancy and credit loss of 5% and

---

[7]    In making this calculation, I have split the 169 square foot difference between the parties' assumptions regarding the saleable area, and assumed that the saleable residential space is 94,227 square feet.

other expenses aggregating $13,707.00 and arrived at net operating income of $413,841.

(*Falsetta Report* at 101.)  He divided the net operating income generated by the commercial

space by a 5.5% capitalization rate and arrived at a value of $7,524,374, which he rounded down

to $7.5 million.  (*Id.* at 101-02.)  Mr. Ryan estimated the gross annual rental at $414,900.00.  He

also deducted a 5% vacancy and collection loss as well as unabated base real estate taxes

($36,009), arrived at a net operating income of $358,146, divided this amount by a 6%

capitalization rate, and concluded that the value of the retail space was $5,969,100, rounded up

to $6 million.  (*Ryan Report* at 93.)  In the end, the experts were $1.5 million apart.

Neither party provided any meaningful evidence about the deductions from the retail

income other than the vacancy loss or the different capitalization rates.  Given the state of the

record, and in light of the immaterial difference in their ultimate opinions, I find that the

appropriate value is the intermediate value, and the selling price of the commercial space is

$6,750,000.

Accordingly, the undiscounted gross sellout price of the residential and commercial units

is $117,466,725.

### 3.    Sellout Expenses

Although the valuation of the retail space reflected certain deductions, the undiscounted

gross sellout price of the residential space did not.  Mr. Ryan estimated that the sellout expenses

would come to $24,290,620 (net of "recapture")[8] during the absorption period, (*Ryan Report* at

104), while Mr. Falsetta valued the gross sellout expenses at $20,706,160.  (*See Falsetta Report*

---

[8]       "Recapture" refers to the owner's declining share of the real estate taxes and common charges resulting
from the sale of the units.  Mr. Ryan computed the total cost to the owner of the common charges and taxes during
the sellout without regard to any sales, but also treated the "recaptured" amount as income.  (*See Ryan Report* at
104.)  Mr. Falsetta essentially aggregated the amounts, and showed the declining cost to the owner as the units are
sold.  (*See Falsetta Report* at 105-08.)

at 105-08.)  More than 50% of the difference is attributable to their assumptions regarding common charges and real estate taxes.

Mr. Ryan assumed common charges of $13.89 per square foot, (*Ryan Report* at 100), which was substantially higher than his other comparables.  (*Id.* at 97.)  Based on his analysis, the owner would bear common charges of $2,244,161.00 (net of "recapture") during the sellout.  (*See id.* at 104.)  The owner would initially bear all of the common charges (as well as real estate taxes, marketing, selling expenses and other expenses) until it began to close on sales.  As the units were sold and the unit owners became responsible for the common charges, the owner would pay less each month on a net basis.  Thus, the effect of any overestimation of the common charges would diminish with time.

Mr. Falsetta assumed that the owner of the project would not pay any common charges (or any other expense) for the first fifteen months that it owned the Building, and estimated that the owner would ultimately pay $718,960.00 in common charges (inclusive of real estate taxes) during the sellout.  (*See Falsetta Report* at 105-06.)  This assumption, which is based on Mr. Falsetta's prediction as to when unit sales would begin to close, is not reasonable.  The common charges reflect, among other things, the Building payroll, fuel and utilities, water and sewer charges, and insurance.  (*See Ryan Report* at 100.)  Although the costs of an occupied building are undoubtedly higher, the owner would still have to bear some of these expenses during the early part of the absorption period, and before it began to close on the sale of condominium units.  For example, the owner would have to pay to secure the Building, maintain insurance coverage, and provide for the upkeep of the Building especially while potential unit buyers viewed the premises.  The owner would also have to pay legal and accounting fees; its professionals might not be willing to wait a year for payment from the sales proceeds.

The same holds true for the real estate taxes.  While the experts disagree over the amount of the real estate taxes as a result of the section 421-a tax benefits, some taxes will still become due and will have to be paid.  Mr. Falsetta's sellout analysis does not account for any of these costs during the first fifteen months.

Another significant difference between the two experts concerned their assumptions regarding a contribution to the Building's reserve fund.  Mr. Ryan observed that the sponsor of a new for-sale development will typically contribute to the working capital fund on a per unit basis.  (*Ryan Report* at 100.)  He estimated that the contribution would be $2,500 per residential unit, or a total of $305,000.  (*Id.* at 100.)  He also estimated that the owner would have to spend $500,000 to address the water damage to several apartments on the third and fourth floors.  (*Id.* at 100.)  Both assumptions are reasonable.  In fact, Mr. Falsetta noted that it would cost the owner $540,000 to complete some minor punch list items and repairs, (*Falsetta Report* at 50), but his analysis does not appear to account for this expense which the owner would presumably have to absorb to ready the Building for unit sales.  Nor does he account for a contribution to the reserve fund.

Accordingly, I reject Mr. Falsetta's estimate of the expenses during the absorption period, and conclude that Mr. Ryan's estimate is more reliable.  However, because Mr. Ryan overestimated the common charges that the owner must pay during the sellout period, I have reduced Mr. Ryan's total sellout expenses by approximately 5% to $23 million.  Deducting this latter sum from the undiscounted gross sellout income of $117,466,725, I find that the undiscounted net sellout income for the Building as a condominium is $94,466,725.

### 4.        The Discount Rate

The last aspect of the experts' opinions concerns the discount rate.  Mr. Falsetta used a 6% discount rate, (*Falsetta Report* at 104), and Mr. Ryan used a 10% rate.  (*Ryan Report* at 102.) The higher the discount rate the lower the value.  Neither of their Reports explained how the rate was selected, and the experts' testimony did not touch on it.  Under the circumstances, I will treat their divergent opinions as the range of rates, and select an intermediate rate of 8%.

Although it may prove difficult to apply the 8% rate to stream of uneven cash flows, it is unnecessary to do so in order to arrive at a present discounted value of the Building's income stream as a condominium.  The first step is to determine how the application of the 6% and 10% discount rates reduced the value of the undiscounted net income predicted by the experts.  Mr. Falsetta's analysis resulted in undiscounted net sellout income of $104,693,840 ($125,400,000 minus $20,706,160.00).  When he applied his 6% discount rate, he arrived at a present value of $93,300,000, (*see Falsetta Report* at 110), or 89.12% of the undiscounted amount.  Mr. Ryan computed the undiscounted net sellout income as $91,253,070.00, and after applying his 10% discount rate, came up with a present discounted value of $76,400,000.  (*See Ryan Report* at 103.)  This reflected 83.72% of the undiscounted value.

The use of an 8% discount rate should result in a reduction between 83.72% and 89.12% to the amount of undiscounted net sellout income computed by the Court.  While the actual percentage reduction would depend on the timing, number and amount of the uneven cash flows, a fair approximation of the effect of the 8% discount rate would be a reduction of 86.42%, the mathematical average of the reductions resulting from the applications of the 6% and 10% rates. This percentage reduction applied to the undiscounted net sellout income computed by the

Court—$94,466,725—yields a present discounted value of $81,638,143.75, rounded up to

$81,650,000, which the Court finds to be the present value of the Building as a condominium.

## C.    Value as a Rental

Both experts valued the Building as a rental using the income capitalization approach.[9]

Under this approach, the expert computes a single year's stabilized net operating income, divides

that amount by an overall capitalization rate ("OAR" or "Cap Rate"), makes some further

adjustments and arrives at value.  The principal factors that affect the value determination are the

rental value per square foot of the residential and commercial space, the amount of time it will

take to reach a stabilized rental (*i.e.*, the absorption period), the operating and lease up expenses

and the Cap Rate.

Initially, the rentable area is less than the saleable area.  In the condominium scenario, the

owner will sell the superintendent's apartment to the condominium association, and receive sale

income.  (*Ryan Report* at 41.)  In the rental scenario, however, the landlord will not receive any

rent from the superintendent.  Both experts recognized that the space attributable to the

superintendent's apartment had to be discounted.  After deducting the superintendent's

apartment, Mr. Ryan calculated the rentable area at 93,627 square feet, (*Ryan Report* at 82), and

Mr. Falsetta calculated it at 93,755 square feet.  (*See Falsetta Report* at 72.)  There is no

explanation for why the previous difference of 169 square feet declined to 128 square feet, but as

with the condominium scenario, I will assume that the intermediate value, 93,691 square feet,

represents  the rentable area.

---

[9]    Mr. Falsetta also performed a discounted cash flow analysis and concluded that the value of the Building as
a rental under this approach was $103 million.  (*Falsetta Report* at 80.)

The experts differed substantially in their opinions regarding the value of the Building as a rental. According to Mr. Falsetta, the Building is worth $103 million. (*Falsetta Supplement* at 7.) Mr. Ryan valued the Building at $70.3 million, or nearly $33 million less than Mr. Falsetta.[10] (*Ryan Report* at 88.) Many of the components of their respective analyses yielded immaterial differences. These included the projected gross rental income from the retail space ($414,900 (FM) versus $450,000 (Debtor)), certain additional income ($61,000 (FM) versus $60,000 (Debtor)), operating expenses ($3,054,869 (FM) versus $3,013,556 (Debtor)), the value of the real estate tax abatement ($7.1 million (FM) versus $7.2 million (Debtor)), the vacancy and credit loss (5% (FM) versus 4% (Debtor)) and the absorption period (five months (Debtor) versus six months (FM)). For the purposes of my analysis, I have treated these differences as ranges, and selected a midpoint value that is reflected in the table at the end of this portion of the opinion. The principal differences in the appraisals centered on the assumptions regarding the Cap Rate and the rental value per square foot.

1.      **Cap Rate**

The Cap Rate is determined by examining recent building sales, preferably in Manhattan. It represents a fraction, expressed as a percentage, in which the numerator is the annual net operating income of the subject building and the denominator is the selling price of the building.

The Cap Rate has a multiplier effect on value. For example, a Cap Rate of 4% means that every additional dollar of net operating income adds $25 of additional value. Mr. Ryan initially selected a Cap Rate of 4.75% which he subsequently reduced to 4.5% (*Ryan Supplement* at 2); Mr. Falsetta used a rate of 4%. (*Falsetta Report* at 79.) The comparable Cap Rates used

---

[10]     Although Mr. Ryan reduced the absorption period and the Cap Rate in his Supplement, he did not modify his opinion regarding value because the "as stabilized" date would be reached in a new tax year.

by Mr. Falsetta in his Report, (*see id.* at 78), were sometimes incomplete and inexact, in some

cases outdated, included buildings outside of Manhattan, and I reject them.  While Mr. Ryan

provided more detailed and useful information, the information did not support his conclusion.

His Supplement and Report listed a total of seven comparable Cap Rates.  (*See Ryan

Report* at 85; *Ryan Supplement* at 5.)  All but one of his rates fell slightly above, slightly below

or right at 4%, and averaged approximately 4.05%.  The seventh Cap Rate was reported as 5%,

something of an outlier compared to the other Cap Rates reported by Mr. Ryan.  It concerned the

sale of the building located at 120 West 21st Street, and was the subject of a fair amount of

testimony and other evidence.  The Debtor brought out through documentary and testimonial

evidence that the building's tax expenses were apparently understated, and consequently, the net

operating income and the resulting Cap Rate should have been lower.  The accuracy of the 5%

figure is highly suspect, and I will disregard it.  Rounding up the average of the other six Cap

Rates, I find that the appropriate Cap Rate is 4.1%.[11]

### 2.    Rental Value per Square Foot

The assumptions regarding the rental value per square foot accounted for the biggest

difference between the two appraisals.  Mr. Ryan estimated a rental value of $65 per square foot,

while Mr. Falsetta testified to a value of $72 per square foot.  To illustrate the significance of this

difference, an additional $7.00 per square foot of value multiplied by 93,691 square feet would

---

[11]    The 4.1% Cap Rate also represents the average Cap Rate if I include 120 West 21st Street but use the 4.5%
Cap Rate that the Debtor advocated for the sale of that building.

increase the annual net operating income by $655,837.  The 4.1% OAR would convert this additional income into roughly $16 million of additional value.[12]

Both experts calculated the square foot rental value by examining the rents in "comparable" buildings.  Each used Silver Towers and MiMA in their analyses.  Several other buildings appeared in one report but not the other.  Two of the other buildings selected by Mr. Falsetta, the Continental and the Beatrice, are located on Sixth Avenue outside of Hell's Kitchen.  Both buildings have superior amenities compared to the Building, and the residential units at the Beatrice start on the twenty-sixth floor while the residential units at the Continental start on the ninth floor.  (*See Falsetta Report* at 62, 66.)  In addition, the average overall rents are higher than the other comparables, (*see id.* at 67), and their inclusion raised the overall average rental value computed by Mr. Falsetta.  The two remaining comparables, Longacre and Archstone West, are older and inferior in quality to the Building, (*id.* at 71), and it is unclear how much useful information they provide.

Three of Mr. Ryan's other comparables—505 W. 37th Street, Townsend and Emerald Green—are located on side streets closer to the garment district and the entrance to the Lincoln Tunnel.  The Archstone Clinton is an older building, erected in 1997.  Mr. Ryan's remaining comparables, the Mercedes House (Phase 1) and the Platinum, provide better comparisons.  In fact, the Platinum, a condominium, is located on 46th Street between Seventh and Eighth Avenues.  (*Ryan Report* at 65.)  Although Mr. Falsetta criticized the use of the Mercedes House in part because it is located three avenues west of the Building on Eleventh Avenue, Silver Towers, one of his comparables, is also located on Eleventh Avenue.

---

[12]    The spread was actually greater because Mr. Falsetta used a lower OAR and Mr. Ryan used a higher one.

Based on the foregoing, I find that the appropriate comparables are Silver Towers,

MiMA, the Platinum and the Mercedes House, although, the Mercedes House did not produce

any rentals that satisfied the criteria described in the next paragraph.  In addition to these

buildings, the Orion, another condominium, is also a comparable.  The Orion was completed in

2006 and is located at Eighth Avenue and 42nd Street, six blocks from the Building.  (*Ryan*

*Report* at 67.)  Clifford Finn, the president of Citi Habitats Marketing Group provided testimony

and documentary evidence regarding a number of recent rentals at that building.  (*See* FMX S.)

As with the condominium analysis, the focus is on the one bedroom, one bathroom

apartments between 700 and 800 square feet.  The following rentals at Silver Towers and MiMA

satisfy these criteria,[13] yielding an average per square foot rental of $72.58, and an average

monthly rental of $4,445.53 for a 735 square foot apartment.

| Comparable | Floor | Sq.  Ft. | $ per sq. ft. | Lease Date |
|------------|-------|----------|---------------|------------|
| MiMA | 12 | 750 | 71.92 | 12/10/11 |
| | 14 | 775 | 70.06 | 12/10/11 |
| | 17 | 775 | 71.92 | 1/13/12 |
| | 25 | 775 | 74.71 | 1/13/12 |
| | 36 | 750 | 68.32 | 10/22/11 |
| | 42 | 720 | 68.25 | 9/30/11 |
| | 43 | 700 | 73.63 | 11/19/11 |
| | 46 | 700 | 76.29 | 12/10/11 |
| Silver Towers | 33 | 700 | 75.34 | 4/26/11 |
| | 33 | 700 | 75.34 | 5/5/11 |

Silver Towers and MiMA enjoy better amenities, (*see Falsetta Report* at 58, 60),

comparable views but inferior locations—they are farther west and more distant from the main

public transportation.  Weighing superior amenities against an inferior location is a highly

---

[13]     In addition to the *Falsetta Report* and *Falsetta Supplement*, rental information also came from FMX S.  Mr.
Ryan reported ranges of rents but did not report the rents attributable to specific apartments.

subjective exercise.  As noted, the mean square foot rental at the two buildings is $72.58, which is rounded down to $72.

The Platinum and the Orion are condominiums, and they require a different consideration.  Clifford Finn testified that there may be as much as a 10% variable in the way condominium and rental square footage is measured.  (Tr. (2/21/12) at 72.)  He did not specifically say how this affected value, but the implication of his testimony was that the variance tended to result in a lower per square foot rental calculation for condominiums.  This does not make sense—a square foot is a square foot—but First Manhattan did not challenge this assumption, and I therefore accept it.

Applying the same criteria outlined above produces the following information about rental activity at the Platinum and the Orion:

| Comparable | Floor | Sq. Ft. | $ per sq. ft. | Lease Date |
|------------|-------|---------|---------------|------------|
| Platinum   | 3     | 751     | 62.32         | 8/23/11    |
|            | 24    | 748     | 59.36         | 7/1/11     |
|            | 12    | 750     | 57.60         | 3/16/11    |
|            | 23    | 750     | 59.20         | 5/3/11     |
| Orion      | 27    | 710     | 62.54         | 8/25/11    |
|            | 51    | 794     | 60.45         | 8/17/11    |
|            | 50    | 768     | 54.69         | 8/10/11    |
|            | 23    | 712     | 54.78         | 7/21/11    |
|            | 59    | 768     | 70.31         | 6/14/11    |
|            | 25    | 729     | 52.26         | 5/31/11    |
|            | 55    | 768     | 54.69         | 5/22/11    |
|            | 45    | 794     | 60.45         | 5/13/11    |
|            | 4     | 712     | 50.56         | 3/14/11    |

The average rental value of these thirteen apartments is $58.40, and the average monthly rental of a 735 square foot apartment would be $3,577.05.  Mr. Finn implied that the average rental should be increased by as much as 10% or approximately $6 per square foot to roughly

17

$64 to account for the variance in the measurement of square footage between a condominium and rental apartment.

Other considerations may also affect value. Both the Orion and the Platinum are slightly older than the Building. (*See Ryan Report* at 65, 67.) This suggests that the Building rental value should be higher. In addition, the Building has the advantage of "exclusivity" — typically three apartments per floor — and this feature adds value. The locations of the Platinum, the Orion and the Building are comparable. The Platinum and the Orion have superior amenities, superior apartment features and superior views compared to the Building, at least according to Mr. Ryan. (*See Ryan Report* at 65, 67, 77.) In fact, Mr. Ryan thought that the condominium sale value of the Platinum comparables should be adjusted downward by 25% and the Orion downward by 30% before using them to determine the square foot selling value of the units in the Building. (*Id.* at 77.)

While I accept the premise that these buildings are superior to the Building, applying the same downward adjustments, averaging 27.5%, to their grossed up aggregate rental value of $64 per square foot would lead to an extraordinary result. The adjustment would suggest that the average rent in the Building should be $46.48 per square foot, and the average monthly rent for a 735 square foot one bedroom, one bathroom apartment should be $2,842. Yet in the fourth quarter of 2011, the average per square foot rental for *all* buildings on the West Side of Manhattan was $55. (FMX H at 2.) Moreover, the average per square foot rental and monthly rent for *all* one bedroom apartments in Manhattan was $53.15 and $3,195, respectively. (*Id.*) In other words, the Building, brand new and located at 48th Street and Eighth Avenue, would skew toward the lower end of the West Side and Manhattan rental markets.

18

This result confirms the conservative nature of Mr. Ryan's adjustments, and I question them as I did when valuing the Building as a condominium.  In addition, condominium units tend to rent at a lower rate because the rentals are generally handled by the unit owner or a broker rather than a professional leasing agent in charge of leasing every unit in the building.  (*See* Tr. (2/15/12) at 91.)  Furthermore, rates for one bedroom apartments in West Side rental markets have generally risen during 2011, (FMX H at 2; *see Ryan Report* at 55-57), and most of the Platinum and Orion comparable lease transactions occurred during the first half of 2011.

Accordingly, I find that a straight average of the comparable rents at the Platinum and the Orion — plus roughly 10% or $64 per square foot — somewhat understates the current market for the Building, and supports an average adjusted rent of $66 per square foot, or a monthly rental of $4,042.50, for a 735 square foot apartment in the Building.  Based on the foregoing, the rents at the four comparable buildings support a range of rents between $66 and $72 per square foot.  The middle value of $69 per square foot, or a monthly rental of $4,226.25 for a 735 square foot one bedroom, one bathroom apartment, reflects the appropriate mark.

### 3.    Other Reductions

#### a.    Lost rent

Both sides recognize that it will take time to lease up the Building, and as a result, the owner will not receive rent from all of the apartments for the entire stabilized year.  Ultimately, Mr. Ryan estimated that the lease up would take six months, (*Ryan Supplement* at 2), while Mr. Falsetta predicted it would take five months.  (*Falsetta Report* at 83.)  Selecting an intermediate range of 5.5 months means that the Building will lose 2.75 months, or approximately 23% of the total rent roll, during the first year.  At $69 per square foot for 93,691 square feet, this translates into lost rent of $1,486,876.17.

19

### b.    Marketing and Lease-up Costs

The landlord will also incur marketing and other expenses during the lease up period, including rent concessions and brokerage fees.  Mr. Ryan assumed a cost of completion of $500,000, and included some lease up expenses in his computation of net operating income. (*See Ryan Report* at 84.)  Mr. Falsetta computed these additional expenses at $1,963,896.  (*See Falsetta Report* at 83.)  As noted earlier, he estimated the cost of completing the punch list and making minor repairs at $540,000, but it does not appear that this amount figured into his analysis.  On the whole, however, his marketing and lease up costs are much greater than Mr. Ryan's.  I find Mr. Falsetta's evidence more credible, as he had the benefit of input from Citi Habitats, an experienced leasing agent, and round up his other expenses to $2 million.  Based on the foregoing, I find that the value of the Building as a rental is $91,719,773.83 (rounded to $91.7 million), as reflected in the following chart:

| | |
|---|---:|
| Rent per square foot | 69.00 |
| Effective Gross Rent ($69 x 93,691) | 6,464,679.00 |
| Retail income | 432,450.00 |
| Additional income | 60,500.00 |
| **Total Income** | 6,957,629.00 |
| Less:  Vacancy & Credit Loss (4.5%) | (313,093.31) |
| Less:  Operating expenses | (3,034,213.00) |
| **Net Operating Income** | 3,610,322.69 |
| Capitalized Value (NOI/4.1% Cap Rate) | 88,056,650.00 |
| Plus:   Tax abatement | 7,150,000.00 |
| Less:   Lost rent (2.75 months) | (1,486,876.17) |
| Less:   Marketing & Lease up costs | (2,000,000.00) |
| **Total Value** | **91,719,773.83** |

Accordingly, the highest and best use for the Building is as a rental, and its value as a

rental is $91.7 million.  I have considered the parties' remaining contentions, and conclude that

they do not alter my findings as set forth above.  The foregoing constitutes the Court's findings

of fact and conclusions of law.

Dated: New York, New York
       March 20, 2012

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge