UNITED STATES BANKRUPTCY COURT      **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:                           :
                                :        Chapter 11
       785 PARTNERS LLC,        :        Case No. 11-13702 (SMB)
                                :
                Debtor.    :
---------------------------------------------------------X

## MEMORANDUM DECISION REGARDING
## THE AMOUNT OF FIRST MANHATTAN'S CLAIM

**A P P E A R A N C E S:**

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299

      Sheldon I. Hirshon, Esq.
      Michael T. Mervis, Esq.
      Craig A. Damast, Esq.
      Lawrence S. Elbaum, Esq.
        Of Counsel

*Attorneys for Debtor and Debtor in Possession*

SILVERMANACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753

      Gerard R. Luckman, Esq.
      Jay S. Hellman, Esq.
      Sheryl P. Giugliano, Esq.
        Of Counsel

      — and —

SCHIFF HARDIN, LLP
666 Fifth Avenue, 17th Floor
New York, NY 10103

      Thomas P. Battistoni, Esq.
      Louis T. DeLucia, Esq.
      Alyson M. Fiedler, Esq.
        Of Counsel

*Attorneys for First Manhattan Developments REIT*

STIEFEL & COHEN
770 Lexington Avenue
New York, NY 10065

    Philip P. Foote, Esq.
        Of Counsel

*Attorneys for Martin McGinn, Aileen McGinn*

JOHN H. SNYDER PLLC
555 Fifth Avenue, Suite 1700
New York, NY 10017

    John H. Snyder, Esq.
        Of Counsel

*Attorneys for Times Square Construction & Development*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

        The Debtor seeks to confirm its plan in this single asset real estate case, and

First Manhattan Developments REIT ("First Manhattan" or "FM"), the principal

secured creditor, has filed objections.  The Court has already determined that First

Manhattan's collateral, the building owned by the Debtor and located at 48th Street

and Eighth Avenue (the "Building"), has a market value of $91.7 million.

(*Memorandum Decision Regarding Value of Debtor's Building*, dated Mar. 20, 2012 (ECF

Doc. # 164).)

        The current dispute concerns the amount of First Manhattan's claim, which the

parties agreed to try on stipulated facts.  For the reasons that follow, the Court

concludes that First Manhattan held a claim, exclusive of attorneys' fees, in the

amount of $96,999,633.54 as of August 3, 2011 (the "Petition Date").  First

Manhattan's allowed claim also includes any subsequent protective advances.

Finally, interest will continue to accrue on the principal balance of $81,212,506.00 and

the protective advances at the Default Rate (as defined under the Loan Documents) to

the extent permitted by 11 U.S.C. § 506(b).[1]

## BACKGROUND [2]

In January 2007, the Debtor borrowed $84,212,506.00 to finance the

construction of the Building from PB Capital Corporation ("PB Capital") and

Commerce Bank, N.A. (which was subsequently acquired by T.D. Bank, N.A. ("TD

Bank", and together with PB Capital, the "Original Lenders"). [3]  (*Stipulation* at ¶ 1.)

The Loans are secured by first priority mortgages (the "Mortgages", and together

with the Notes and all other documents executed in connection therewith, the "Loan

Documents") on the Building and the Units (as defined in the Loan Documents).  (*Id.*

at ¶ 2.)  The Original Lenders received additional security in the form of the pledge of

certain contract deposits (see footnote 1) and a $3 million letter of credit.  (*See id.* at ¶

3.)  First Manhattan is the assignee of the Original Lenders, and holds all of their

rights under the Loan Documents.  (*Id.* at ¶ 4.)

The Loans matured on August 7, 2009 (the "Maturity Date").  (*Id.* at ¶ 5.)  In or

around August 2009, the Original Lenders drew down the Letter of Credit, and as a

---

[1]     Although First Manhattan's pre-petition claim already exceeds the value of the Building, First
Manhattan may also have a security interest in an escrow fund in the approximate sum of $18 million.
Consequently, it may be oversecured, and this opinion assumes that it is.

[2]     In this opinion, "*Stipulation*" refers to the *Stipulation as to Claim of First Manhattan Developments
REIT*, dated Mar. 13, 2012 (ECF Doc. # 158), "JX" refers to the joint exhibits submitted by the parties,
and "DX" refers to the Debtor's exhibits.

[3]     The original loan was evidenced by three promissory notes executed pursuant to the Transfer
Loan Agreement, the Building Loan Agreement ("BLA") and the Project Loan Agreement (collectively,
the "Loans" or "Notes").  (*Stipulation* at ¶ 1.)  JX 5 includes copies of the Loans.

result, the principal amount presently due on the Loans is $81,212,506.  (*Id.* at ¶ 5.)

The Debtor has not made or been credited with any payments after the Maturity

Date, (*id.* at ¶ 9), except for the drawdown of the $3 million letter of credit.  (*Id.* at ¶ 9

n. 4.)

A.    **The Effect of a Default**

The provisions governing the accrual and obligation to pay interest (including

regular and default interest and a late payment fee) on the Loans are found in the

BLA (and incorporated by reference in all of the Notes).  (*Id.* at ¶ 6.)  Pursuant to

Sections 2.12 and 2.13 of the BLA, prior to the occurrence of an Event of Default (as

that term is defined in the BLA), the Debtor could select to have portions of the Loans

bear interest based on the one-month London InterBank Offered Rate ("LIBOR") for

different amounts and different periods, essentially bearing interest at the one-month

LIBOR plus 2.75% per annum (the "LIBOR Rate").  The Debtor could also select the

prime rate as reported in the Wall Street Journal plus 1.75% per annum (the "Base

Rate").  (*Stipulation* at ¶ 7.)

This option terminated once the Loans matured without payment or an Event

of Default occurred.  (*See* BLA § 2.15.)   At that point, the interest rate on the Loans

became fixed at the Base Rate (prime plus 1.75%).  (*Stipulation* at ¶ 8.)  The Debtor's

default also triggered two additional categories of other costs.  First, the Loans

accrued interest at the Default Rate which consisted of the Base Rate plus 5%.  (BLA §

2.12.)   The Base Rate has been 5% at all relevant times since the Maturity Date, and

consequently, the Default Rate has been 10% at all relevant times since the Maturity

Date. (*Stipulation* at ¶ 13.)

Second, the BLA imposed a late payment fee of 5% ("Late Payment

Premium"). Section 2.16 of the BLA provides, in pertinent part, as follows:

> Borrower shall pay to Administrative Agent, for the account of Lenders,
> a late payment premium in the amount of 5% of any payments of
> regular principal, interest, fees or other amounts payable under the
> Loan Documents made more than five (5) days after the due date
> thereof, which late payment premium shall be due with any such late
> payment. The late payment premium is to cover administrative and
> related expenses incurred in handling delinquent payments.

The late payment provision does not contain an exception for the "balloon payment"

of principal due on maturity.[4] (*Stipulation* at ¶ 14.)

**B.    The Claim Asserted by First Manhattan**

On or about July 11, 2011, PB Capital sent the Debtor a pay-off letter (the "Pay-

Off Letter") (JX 6), showing the amount that would be due as of August 3, 2011,

which turned out to be the Petition Date. The Pay-Off Letter included the following

items:

| | |
|---|---|
| Principal amount due | 81,212,506.00 |
| Regular Interest (Base Rate = 5%) due | 6,699,340.16 |
| Default Interest (5%) due | 8,024,785.13 |
| Administrative Fees due ($6,000 per month) | 138,000.00 |
| Late Payment Premium due | 3,845,369.25 |
| Protective Advances and Enforcement Costs due | 886,690.23 |

---

[4]     Section 6.19 of the BLA also imposes an administration fee of $6,000 per month during the life
of the Loans (the "Administrative Fee"). (*Stipulation* at ¶ 14.)

5

| Protective Advances Default Interest due | 38,312.02 |
|---|---|
| **Total amount due** | **100,845,002.80** |

(*Stipulation* at ¶ 15.) [5]

Prior to entering the *Stipulation*, First Manhattan filed a timely proof of claim (No. 1-1) and an amended proof of claim (No. 1-2) in the amount of $105,747,439.56 as of January 2, 2012, further preserving the right to seek payment of all interest, legal fees, costs and charges that continue to accrue under the Loan Documents.  (*Id.* at ¶ 22.)

C.      **The Parties' Contentions**

The Debtor does not challenge the vast majority of the First Manhattan claim. It acknowledges that First Manhattan is entitled to payment of its principal, the pre-petition interest at the non-Default Rate provided in the BLA and the monthly Administrative Fee.  These total $89,800,332.  (*Debtor's Reply to First Manhattan Developments REIT's Memorandum of Law in Support of its Proof of Claim and in Support of the Allowance of Default Interest*, dated Mar. 20, 2012, at 14 (ECF Doc. # 166).)  The Debtor also concedes that the claim properly includes the protective advances by the Original Lenders and First Manhattan in the amount of $1,254,162.67 through February 29, 2012, not including interest or any legal fees.  (*Stipulation* at ¶ 21.)

---

[5]      In addition to the $663,791.10 in protective advances incurred by PB Capital (not including legal fees or interest) through and as of the Petition Date, First Manhattan made additional protective advances totaling $590,371.57.  Thus, the combined total of protective advances was $1,254,162.67 through February 29, 2012, not including interest or any legal fees.  Pursuant to the *Stipulation*, the parties accept and waive any challenge to the protective advances.  In addition, they acknowledge that First Manhattan is accruing and will continue to accrue additional protective advances, for which First Manhattan is entitled to seek reimbursement.  (*Stipulation* at ¶ 21.)

Instead, the dispute focuses on the allowance of the Default Rate (both pre-petition and post-petition) and the Late Payment Premium, and the amount of the attorneys' fees, although the latter will be addressed in a separate opinion.  In a nutshell, the Debtor contends that the Late Payment Premium is not recoverable under the terms of the BLA, and the Late Payment Premium and the Default Rate are unenforceable penalties, inequitable and unreasonable.

## DISCUSSION

A.      **Pre-Petition Default Interest**

"Prepetition interest is generally allowable to the extent and at the rate permitted under the applicable nonbankruptcy law, including the law of contracts." *In re Milham*, 141 F.3d 420, 423 (2d Cir. 1998); *accord In re Arcade Publ'g, Inc.*, 455 B.R. 373, 378 (Bankr. S.D.N.Y. 2011) (quoting *In re Milham*, 141 F.3d at 423); *see Vanston Bondholders Prot. Comm. v. Green*, 329 U.S. 156, 161 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law.")  An event of default or the maturity of the debt will often trigger a higher interest rate, and "[i]t is well settled that an agreement to pay interest at a higher rate in the event of default or maturity is an agreement to pay interest and not a penalty."  *Jamaica Sav. Bank, FSB v. Ascot Owners, Inc.*, 665 N.Y.S.2d 858, 858 (N.Y. App. Div. 1997); *accord Union Estates Co. v. Aldon Constr. Co.*, 116 N.E. 984, 985 (N.Y. 1917) ("[A]n agreement to pay interest upon a loan from its date until its payment at a rate before and a differing rate after its

7

maturity is an agreement to pay interest and not a penalty as to the latter rate.")    A

higher default interest rate reflects the allocation of risk as part of the bargain struck

between the parties, a bargain that benefits the obligor as well as the obligee:

> A variable interest . . . can be beneficial to a debtor in that it may enable
> him to obtain money at a lower rate of interest than he could otherwise
> obtain it, for if a creditor had to anticipate a possible loss in the value of
> the loan due to his debtor's bankruptcy or reorganization, he would
> need to exact a higher uniform interest rate for the full life of the loan.
> The debtor has the benefit of the lower rate until the crucial event
> occurs; he need not pay a higher rate throughout the life of the loan.

*Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959), *cert. denied*, 361 U.S. 947 (1960);

*accord Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 625 (2d Cir. 1989) ("[T]he Court

observed [in *Ruskin*] that debtors might fare worse in the future if creditors were not

allowed to impose variable rates, because creditors would then impose higher rates

for the full life of the loan in order to reallocate the risk.").

Even where the default rate strikes the judge as high, a court cannot rewrite

the parties' bargain based on its own notions of fairness and equity.  *Cruden v. Bank

of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) ("A court may neither rewrite, under the

guise of interpretation, a term of the contract when the term is clear and

unambiguous . . . nor redraft a contract to accord with its instinct for the dispensation

of equity upon the facts of a given case.") (citation omitted); *In re Johns-Manville Corp.*,

No. 11 Civ. 1312 (JGK), 2012 WL 667084, at *10 (S.D.N.Y. Mar. 1, 2012) ("New York

law is clear that subjective notions of fairness or equity are not a permissible basis for

a court to rewrite a contract or to excuse compliance with conditions precedent.");

*Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002) ("[I]f the agreement

8

on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."); *see In re Woodmere Invs. Ltd. P'ship,* 178 B.R. 346, 355 (Bankr. S.D.N.Y. 1995) ("[W]hen two sophisticated parties enter into a contract calling for an established rate on default, this Court will not disturb the agreement absent persuasive evidence of overreaching.")  The requirement that the agreement must be enforced in accordance with its terms "has even greater force in the context of real property transactions, where commercial certainty is a paramount concern and where, as here, the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." *Wallace v. 600 Partners Co.,* 658 N.E.2d 715, 717 (N.Y. 1995) (internal quotation marks and citations omitted); *accord Vermont Teddy Bear Co., Inc. v. 535 Madison Realty Co.,* 807 N.E.2d 876, 879 (N.Y. 2004).

Here, there is no basis in law to disturb the parties' bargain.  The Debtor and the Original Lenders were sophisticated parties that entered into an $84 million real estate loan agreement.  Each was represented by counsel, and there is no evidence of overreaching.  They agreed to allocate the risk of default by, among other things, including an unambiguous provision that increased the non-Default Rate by 5% in the event of a default.  One can only speculate whether the non-Default Rate would have been greater if the parties had not included a separate default rate of interest.

The Debtor's appeal to equitable considerations has no place under New York law. In any event, many of its arguments, including the penal nature of the Default Rate, also apply to the allowable amount of post-petition interest, and will be addressed in the next section. Nevertheless, certain of the Debtor's points deserve comment at this time.

The debtor primarily relies on *400 Walnut Assocs., L.P v. 4th Walnut Assocs., L.P. (In re 400 Walnut Assocs., L.P.)*, 461 B.R. 308 (Bankr. E.D. Pa. 2011) to support its argument that a bankruptcy court can reduce or nullify the Default Rate applicable to the pre-petition portion of the secured claim based on equitable considerations. There, the debtor in a single asset real estate case objected, *inter alia*, to the default rate of interest included by the secured creditor in the pre-petition and post-petition portions of its claim. The debtor acknowledged that the loan documents provided for the default rate of interest used by the secured creditor, but argued that it was inequitable to allow the secured creditor to recover default interest. Relying on the factors that a court generally considers in determining the appropriate interest rate under 11 U.S.C. § 506(b), the court disallowed the portion of the claim relating to default interest. *Id.* at 315-17.

Section 506(b), which is discussed in the next section of this opinion, gives a bankruptcy court limited discretion to modify the amount of *post-petition* interest that an oversecured creditor may collect as part of its claim. Section 506(b) does not apply to a creditor's claim for pre-petition interest, a claim that must instead be determined

10

under state law. *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 131 (Bankr. E.D.N.Y. 2002); 4 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 506.04[1], at 506–95 (16th ed. 2012) ("COLLIER ON BANKRUPTCY"). Furthermore, *400 Walnut* dealt with Pennsylvania law. Accordingly, it is not persuasive.

In arguing the equities of the pre-petition claim, the Debtor also focuses improperly on what First Manhattan paid for the Loans in July 2011, the risks that it faced and the time and effort it has expended in enforcing the Loans. First Manhattan is the assignee of the Original Lenders. It stands in the shoes of its assignor, and takes neither more nor less than the assignor had. *Trans–United Indus., Inc. v. Cohn,* 351 F.2d 605, 606 (2d Cir.1965). That the Debtor's existing default may have been factored into the price that First Manhattan paid to the Original Lenders is a matter between those parties. As between First Manhattan and the Debtor, First Manhattan stands in the shoes of the Original Lenders, and can assert the same rights subject to the same limitations that the Original Lenders could have asserted if they still owned the Loans. Making equitable determinations of claim allowance based on what an assignee knew about and paid for a claim would require a court to examine the circumstances of every assignment to determine the allowed amount of the claim in the hands of the assignee.

## B.    Post-Petition Interest

Under general equitable principles of insolvency law, interest ceases to accrue at the beginning of the proceedings. *Vanston*, 329 U.S. at 163. There are three reasons

11

for the rule:  (1) post-petition interest is a penalty imposed for a delay of payment

required by law to allow the preservation and protection of the estate for the benefit

of all interests, (2) the rule avoids the administrative inconvenience of continuously

recomputing claims, and (3) it avoids the gain or loss as between creditors whose

obligations bear different interest rates or who receive payment at different times.  *Id.*

at 163-64.  This rule is currently embodied in 11 U.S.C. § 502(b)(2), which disallows a

claim for unmatured interest.

The rule does not, however, apply to an oversecured creditor who is entitled to

post-petition interest up to the value of its collateral.  *See Vanston,* 329 U.S. at 164.

This exception is now contained in 11 U.S.C. § 506(b), which states:

> To the extent that an allowed secured claim is secured by property the
> value of which, after any recovery under subsection (c) of this section, is
> greater than the amount of such claim, there shall be allowed to the
> holder of such claim, interest on such claim, and any reasonable fees,
> costs, or charges provided for under the agreement or State statute
> under which such claim arose.

Section 506(b) does not state that the oversecured creditor is entitled to collect post-

petition, or pendency, interest at the contract rate.  *Milham,* 141 F.3d at 423.  Pendency

interest is not based on contract and fixing the appropriate rate rests with the "limited

discretion" of the bankruptcy court.  *Id.*

There is nevertheless a rebuttable presumption that the oversecured creditor is

entitled to default interest at the contract rate subject to adjustment based on

equitable considerations.  *In re Terry Ltd. P'ship,* 27 F.3d 241, 243 (7th Cir. 1994), *cert.*

*denied sub nom., Invext Holdings, N.V. v. Equitable Life Ins. Co. of Iowa,* 513 U.S. 948

(1994); *In re Urban Communicators PCS Ltd. P'ship*, 394 B.R. 325, 338 (S.D.N.Y. 2008); *In re General Growth Props., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011); *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998); *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998); *see generally* 4 COLLIER ON BANKRUPTCY ¶ 506.04[2][b], at 506-102 (collecting cases).  The power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty.  *Urban Communicators*, 394 B.R. at 338; *General Growth*, 451 B.R. at 328; *In re P.G. Realty Co.*, 220 B.R. 773, 780 (Bankr. E.D.N.Y. 1998).  The debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition.  *See In re Southland Corp.*, 160 F.3d 1054, 1059-60 (5th Cir. 1998); *Urban Communicators*, 394 B.R. at 338; *Vest Assocs.*, 217 B.R. at 702.

The Debtor has failed to sustain this burden.  There is no evidence of misconduct by First Manhattan.  In addition, the Debtor has failed to offer proof that the application of the Default Rate will harm the unsecured creditors or impair its fresh start.  To the contrary, the Debtor proposes to pay the unsecured creditors in full and permit equity to retain their interests.  Thus, the Debtor is solvent, and the reluctance to modify the contract interest rate is especially strong where the debtor is solvent.  *Urban Communicators*, 394 B.R. at 340 (citing *Ruskin*); *In re 139-141 Owners Corp.*, 313 B.R. 364, 369 (S.D.N.Y. 2004) ("[I]t would be inequitable and inappropriate

13

to deny a creditor's right to interest at the default rate, particularly where the debtor was solvent and knowingly bargained for the terms of his contract.") (citing *Ruskin*). Reducing the contract interest payable by a solvent debtor would unfairly grant a windfall to its equity. *See Urban Communicators*, 394 B.R. at 340 ("[I]t is not inequitable to cut down the interest of Debtors' shareholders by interest payments at a default rate to which Debtors contractually agreed.").

Nor has the Debtor offered proof that the allowance of interest at the Default Rate will impair its fresh start. While this may ultimately come down to a question of feasibility, the Debtor has not argued and certainly has not shown that it cannot confirm its plan and continue operating if First Manhattan's claim includes post-petition interest at the Default Rate.

Finally, the Debtor has failed to show that the Default Rate constitutes a penalty. The Bankruptcy Code does not provide guidance regarding when a default interest rate will be deemed a penalty, and the issue should turn on applicable non-bankruptcy law. 4 COLLIER ON BANKRUPTCY ¶ 506.04[2][b], at 506-104. As noted earlier, under New York law, a variable interest rate that increases following a default is not a penalty. *Ruskin*, 269 F.2d at 832; *Union Estates*, 116 N.E. at 985.

The Debtor nonetheless analogizes the Default Rate to liquidated damages, and argues that it is so disproportionate to the damages suffered by either the Original Lenders or First Manhattan that it should be deemed an unenforceable penalty. The Debtor has not identified any authority that applies a liquidated

14

damages analysis to a default interest clause in a loan negotiated by sophisticated parties. In any event, should the Court adopt the Debtor's approach and treat the Default Rate as a form of liquidated damages, its challenge would still fail.

Under New York law, "[a] contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 361 N.E.2d 1015, 1018 (N.Y. 1977). "In determining whether the amount of the deposit is to be treated as liquidated damages or as a penalty, the agreement is to be interpreted as of its date, not as of its breach." *Seidlitz v. Auerbach*, 129 N.E. 461, 462 (N.Y. 1920); *accord Truck Rent-A-Center*, 361 N.E.2d at 1019.

The Debtor's arguments regarding the inequitable, unreasonable and penal nature of the Default Rate, and particularly, whether it covered the additional costs of administering a loan in default, is primarily based on hindsight. The Debtor devotes its discussion to the amount of time that the Original Lenders spent *after* the default dealing with the Loans, emphasizing First Manhattan's inability to quantify these efforts due to the lack of time records. (*See Stipulation* at ¶¶ 16-20.) The Debtor has not offered any evidence regarding the parties' intentions or the reason for the selection of the 5% Default Rate when they entered into the Loans, and the Debtor's *post hoc* analysis of the time spent addressing the Loans after default sheds no light on

this question.[6]  Moreover, under New York law, the 5% differential between the non-

Default and Default Rates falls within the range of reasonableness.[7]  *Vest Assocs.*, 217

B.R. at 703; *see In re South Side House, LLC*, 451 B.R. 248, 266 (Bankr. E.D.N.Y. 2011)

("The Lender's claim for prepetition interest at a default rate of five percent is a

permissible charge under New York law.").

The Debtor also relies on the deposition testimony of two representatives of

the Original Lenders who described the Default Rate as a penalty.  Brian Terry, TD

Bank's Rule 30(b)(6) designee, testified at his deposition that the Default Rate was put

in "to control or to have assurances that things are abided" to the requirements of the

BLA; *i.e.*, "it would be a penalty if things are not adhered to in accordance with the

building loan agreement."  (DX 32, at 27-28.)  Robert Persico, the representative of PB

---

[6]        The Debtor also minimizes First Manhattan's risks.  In addition to monitoring the effects of the
Debtor's default, it has been compelled to make protective advances.  In essence, First Manhattan has
been forced to fund additional loans to protect its collateral without any assurance that its collateral
will be sufficient to satisfy these additional loans.

[7]        In arguing that the default interest is inequitable and an unenforceable penalty, the Debtor
contends that the interest rate tripled following the Maturity Date and default in payment.  The
argument is factually wrong and beside the point.  As discussed, following the default, the Debtor lost
the option to select the LIBOR Rate as an alternative to the Base Rate.  At all relevant times, the LIBOR
Rate was around 3% while the Base Rate was 5%.  Thus, the Debtor's default and resulting loss of the
option led to a 2% rise in the interest rate.

The Debtor mischaracterizes this 2% as default interest.  There is no evidence that when the
parties entered into the BLA, they knew which of the two rates would be higher at the time of the
default.  In fact, the option implies that the Base Rate might be lower than the LIBOR Rate; otherwise,
there would be no reason for the option in the first place.  Consequently, the loss of the option could
have resulted in the use of a Base Rate that was lower than the LIBOR Rate.

Furthermore, the doubling of the interest rate following default, from 5% to 10% does not
mean that the default rate is a penalty.  Relying on the percentage increase is unpersuasive since, as
First Manhattan points out, an increase from 1% to 2% reflects a 100% increase.  Rather, where the
borrower does not challenge the pre-default interest rate, the focus should be on the spread between
the pre-default and post-default rates.  As noted, a 5% spread is reasonable under New York law, and
the Debtor has certainly failed to adduce any evidence to support its argument that it is not.

Capital, characterized the default rate of interest as "a 5 percent penalty charged on the passed *[sic]* due interest amount."  (DX 39, at 20.)  First Manhattan's attorney objected to the form of the question that provoked Mr. Persico's answer, and objected to both portions of testimony on the ground that the characterization of the Default Rate as penalty constituted a lay legal conclusion.

Although I overrule the objections, the testimony does not prove what the Debtor contends.  All higher default rates of interest have some penal effect in that they compel the timely compliance with the payment requirements under a loan agreement; if you default you pay more.  Both witnesses obviously viewed the Default Rate in this manner.  In any event, their characterization does not bind the Court or undercut the conclusion that the Default Rate of interest was designed to compensate the Original Lenders for the increased risk of non-payment and the costs associated with the Debtor's default.

## C.    Late Payment Premium

Although interest at the Default Rate is allowable, the Late Payment Premium is not.  The BLA § 2.16 imposes an additional fee of 5% "of amounts payable under the Loan Documents" that are more than five days late, "which late payment premium shall be due with any such late payment.  The late payment premium is to cover administrative and related expenses incurred in handling delinquent payments."  Thus, the Late Payment Premium relates to (1) late payments due under

17

the Loan Documents, (2) payable at the time of the late payment, and (3) it is intended to cover the additional costs of handling the late payment.

Here, the Debtor will never make a late payment of an amount due under the Loan Documents, and First Manhattan will not, therefore, incur the additional costs of handling such a late payment. The confirmation of a plan of reorganization binds all creditors and parties in interest. 11 U.S.C. § 1141(a). Upon confirmation, and unless the plan or confirmation order state otherwise, the property of the estate vests in the reorganized debtor free and clear of liens, claims and interests, and all debts are discharged. 11 U.S.C. §§ 1141(c), (d). As a consequence, all obligations and rights of the parties are extinguished and replaced by the plan. *See Bennett v. Intermountain Fed. Land Bank Ass'n (In re Bennett)*, No. 98-16177, 2000 WL 123233, at *2 (9th Cir. Jan. 28, 2000); *Lockheed Martin Corp. v. Singer, N.V.*, No. 02 Civ. 3374 (TPG), 2006 WL 2548491, at *2 (S.D.N.Y. Sept. 1, 2006); *FDIC v. Lewittes (In re Friedberg)*, 192 B.R. 338, 341 (S.D.N.Y. 1996).

The Debtor's plan (*see Debtor's Third Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated Dec. 13, 2011 ("*Plan*") (ECF Doc. # 107)) will extinguish First Manhattan's rights under the Loans. In lieu of those rights, First Manhattan will receive an "Amended and Restated Note"[8] and an "Amended and

---

[8]     The *Plan* defines the "Amended and Restated Note" as "the note, the form of which shall be included in the Plan Supplement, to be issued by the Reorganized Debtor to the Holder of the Allowed First Manhattan Claim, and which shall contain the terms described in Section 3.6(c) of the Plan and which shall be in form and substance reasonably acceptable to the Debtor and First Manhattan." (*Plan* at § 1.1, p. 2.)

Restated Mortgage."[9]  (*See Plan* at § 3.6(c).)  All subsequent payments by the Debtor

on account of First Manhattan's secured claim will be made under the Plan and the

new note and mortgage rather than the Loan Documents, and First Manhattan will

not incur any costs handling late payments under the Loans Documents.

Accordingly, the late payment charge will never become due and will never be

earned.  *See Woodmere Invs. Ltd. P'ship*, 178 B.R. at 355 (disallowing late payment

charge where the debtor failed to make any payments to the secured creditor, and

hence, the latter did not incur the additional expenses of handling delinquent

payments).

On a separate note, the secured creditor is limited under 11 U.S.C. § 506(b) to

recovering "reasonable" fees provided for in the agreement.  *United States v. Ron Pair

Enterprises, Inc.*, 489 U.S. 235, 241 (1989).  "The decisional law is uniform that

oversecured creditors may receive payment of either default interest or late charges,

but not both."  *Vest Assocs.*, 217 B.R. at 701; *accord In re Dixon*, 228 B.R. 166, 177 (W.D.

Va. 1998); *In re Market Center East Retail Property, Inc.*, 433 B.R. 335, 365 (Bankr. D.N.M.

2010); *In re Cliftondale Oaks, LLC*, 357 B.R. 883, 887 (Bankr. N.D. Ga. 2006); *In re Route

One West Windsor Ltd. P'ship*, 225 B.R. 76, 92 (Bankr. D.N.J. 1998); *In re 1095

Commonwealth Ave. Corp.*, 204 B.R. 284, 305 (Bankr. D. Mass. 1997); *In re Kalian,* 178

B.R. 308, 312 n. 9 (Bankr. D.R.I. 1995) (citing cases).  The reason is that the late fee and

---

[9]      The *Plan* defines the "Amended and Restated Mortgage" as "the mortgage securing the
Amended and Restated Note, the form of which shall be included in the Plan Supplement, and which
shall be in form and substance reasonably acceptable to the Debtor and First Manhattan."  (*Plan* at §
1.1, p. 2.)

default interest are designed to compensate the lender for the same injury, and

awarding both amounts to double recovery. *Cliftondale Oaks*, 357 B.R. at 887.

First Manhattan is entitled to recover post-petition interest at the Default Rate

which, as of the Petition Date, totaled over $8 million and continues to accrue to the

extent that First Manhattan is oversecured. First Manhattan is also entitled to receive

a monthly Administrative Fee in the sum of $6,000 during the entire life of the Loans.

The accrued, unpaid Administrative Fees totaled $138,000 as of the Petition Date, and

the Debtor has not objected to this amount. The additional costs incurred in handling

payments, late or otherwise, are already covered by the Default Rate of interest and

the Administrative Fee, and any additional charge in the form of the Late Payment

Premium would provide a double recovery.

## CONCLUSION

First Manhattan held a claim, exclusive of attorneys' fees, in the amount of

$96,999,633.54 as of the Petition Date. First Manhattan's allowed claim also includes

any post-petition protective advances and post-petition interest at the Default Rate to

the extent permitted by 11 U.S.C. § 506(b). The foregoing constitutes the Court's

findings of fact and conclusions of law. To the extent that the Court has not

specifically addressed any of the parties' arguments that are inconsistent with these

findings and conclusions, the Court has considered these arguments and concluded

that they lack merit.

Dated: New York, New York
      April 9, 2012

                              /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                              United States Bankruptcy Judge